[874 NYS2d 475]

The People of the State of New York, Respondent, v Jed Kass, Appellant.

Second Department, December 9, 2008

## APPEARANCES OF COUNSEL

*Lynn W.L. Fahey*, New York City (*Kendra L. Hutchinson* of counsel), for appellant.

*Richard A. Brown, District Attorney*, Kew Gardens (*John M. Castellano, Sharon Y. Brodt* and *Anastasia Spanakos* of counsel), for respondent.

## OPINION OF THE COURT

FISHER, J.

In this extraordinary case, we find that the defendant was deprived of a fair trial by the combination of the trial court's mishandling of hearsay objections and its refusal to give a missing witness charge as to a registered jailhouse informant. Accordingly, we reverse the judgment and order a new trial.

While incarcerated and awaiting trial on an embezzlement charge, the defendant allegedly asked a fellow inmate to introduce him to people who, for money, would be willing to kill two witnesses who were expected to testify against him. The inmate turned out to be a registered jailhouse informant who, at the time, was working with police on another case in which he reported that a different prisoner had also solicited his help in hiring a hit man. In the words of the lead detective in that case, in return for his help, the informant was looking for a "get out of jail free card."

After the informant alerted the police to the defendant's alleged request, an investigation was begun involving undercover police officers posing as contract killers. The investigation ultimately led to the defendant's arrest. At trial, the position of the defense was that it was the informant who had first suggested, and then insisted, that the defendant speak with "hit men," and that the defendant had done so only because he was afraid of the informant. Remarkably, the defendant's claim that he feared the informant was supported at trial, not only by his own testimony and the testimony of a fellow inmate, but also by the testimony of three correction officers, one a captain, who, among other things, confirmed that the defendant had urgently requested an immediate transfer to a different part of the jail to get away from the informant.

The prosecution offered evidence at trial that, after learning of the defendant's alleged interest in arranging a murder-for-hire, undercover officers posing as hit men made contact with him through the informant. The defendant agreed to speak

with them over the telephone and to meet one face-to-face at Rikers Island. Notably in that regard, the correction officers testified that, when asking for a transfer, the defendant had explained that the informant was insisting that he speak with someone on the phone and meet with a stranger at the jail, and wanted him to say something that he did not want to say. According to one correction officer to whom the defendant described his situation in greater detail, the defendant told him specifically that he did not want to hire anyone to make a "hit." Significantly, the defendant's conversations with the correction officers occurred before he was given any reason to believe that he was under investigation.

The undercover police officers tape recorded all of their conversations with the defendant. Many extended portions of the tapes were inaudible, but the prosecution claimed that the audible portions confirmed that the defendant wanted the witnesses killed and was willing to pay someone to do it. The defendant, on the other hand, offered a different interpretation of the recorded conversations. He testified that not only did he have no intention of harming the witnesses but also, having been told that the "hit men" would take no action without first receiving partial payment, he stalled them by never paying them anything despite their persistent demands for money. The tapes confirm that the defendant repeatedly assured the undercover officers that his cousin was flying to New York with the money to pay them, but there was no evidence that the defendant even had a cousin, much less that any cousin of his was planning to come to New York with money. And it is undisputed that no money ever changed hands.

The jury nevertheless convicted the defendant of conspiracy in the second degree and criminal solicitation in the second degree. On appeal, the defendant argues, inter alia, that the police engaged in egregious misconduct which, in effect, manufactured the crime and thereby violated his due process rights. He also argues that the trial court made a number of erroneous rulings that collectively deprived him of a fair trial.

We reject the defendant's contention that the conduct of the police violated his due process rights. To the contrary, the reaction of the police to the information they received was entirely appropriate. A registered informant reported that an inmate in a city jail was attempting to arrange the murder of two witnesses. Upon receiving such information, the police were duty bound to protect the alleged targets and pursue an

investigation (*see People v Moe*, 227 AD2d 253 [1996]). They did the first by notifying the targets and offering them police protection; they did the second by using undercover officers to make contact with the defendant to explore his intentions. Contrary to the defendant's contentions, there is no showing here of a due process violation as there was no evidence that the police set out to manufacture rather than investigate a crime, or that they engaged in criminal or improper conduct repugnant to a sense of justice, or that they persistently solicited the defendant to commit the crime in the face of his unwillingness to do so, or that their desire was solely to obtain a conviction rather than to prevent the crime and protect the alleged targets (*see People v Isaacson*, 44 NY2d 511, 521 [1978]; *People v Spence*, 39 AD3d 673 [2007]; *People v Colon*, 289 AD2d 253, 253-254 [2001]; *People v McDougal*, 221 AD2d 374 [1995]). We turn, then, to the defendant's claim that a combination of trial errors deprived him of a fair trial.

To convict the defendant of the charged crimes of conspiracy in the second degree and criminal solicitation in the second degree, the People were required to prove beyond a reasonable doubt, inter alia, that the defendant actually intended that the named targets be killed (*see* Penal Law §§ 100.10, 105.15). The defendant testified that he harbored no such intent and that he agreed to speak with the "hit men" only because the informant had continually pressured him to do so, at one point warning him that "if you jerk my friends, I will snap your head like a twig."

■ The principal issue at trial, therefore, was whether the defendant had the requisite intent for the commission of the charged crimes, that is, whether he actually intended that the witnesses be killed, or, instead, having no such intent, had agreed to speak to the "hit men" only because of unrelenting pressure exerted on him by the informant. We do not quarrel with our dissenting colleagues' assertion that, on the audible portions of the tapes, the defendant is heard responding to statements made by the undercover officers in ways that might well be construed as consistent with an intent to arrange a contract killing. As our dissenting colleagues correctly observe, for example, the recorded conversations "included, inter alia, the defendant's affirmative agreement . . . that the victims be 'taken care of,' that one victim will get 'two in his head' and the other taken some place to 'put him out' in ways to make them look like victims of random crime, and that the defendant's

'problems are going to be eliminated.' " Those words certainly were spoken, but not by the defendant.

Posing as a hit man, Detective James MacDonald had a telephone conversation with the defendant on January 17, 2003. In pertinent part, the exchange was as follows:

> "DETECTIVE MACDONALD: [W]e're good to go, we're all set up.
>
> "DEFENDANT: Ok.
>
> "DETECTIVE MACDONALD: Ok. 'Cause what do you call it, let me tell you somethin'. Dave is takin' care of one, I'm takin' care of the other.
>
> "DEFENDANT: Ok. . . .
>
> "DETECTIVE MACDONALD: And then your cousin's going to give us the money? As soon as I get the money in hand, Dave's gonna make his visit, I'm gonna make my visit.
>
> "DEFENDANT: Ok. . . .
>
> "DETECTIVE MACDONALD: Your problems are going to be eliminated.
>
> "DEFENDANT: Ok. . . .
>
> "DETECTIVE MACDONALD: Ok. Cool. And then the other thing is, is that a, what do you call it, we came up with a, you know me and Dave talked about it . . . And I think what we're gonna do is, we're gonna make 'em, you know the Lexus guy, we're make him look like, you know, he was in a car jacking or something.
>
> "DEFENDANT: Ok.
>
> "DETECTIVE MACDONALD: We're gonna put two in his head and leave him there and take the car and dump it. Ok? The other guy, we're just gonna turn around, snatch him up, and just take him someplace, and then put him, put him out.
>
> "DEFENDANT: Ok.
>
> "DETECTIVE MACDONALD: Ok? And then he's gonna be, like I said, the one guy, he's not going to be found. Ok?

> "DEFENDANT: Uh-huh.
>
> "DETECTIVE MACDONALD: And then this way, every-thing is all good to go, one guy looks like he's the victim of a crime and the other guy just looks like he disappeared or some shit . . .
>
> "DEFENDANT: Ok.
>
> "DETECTIVE MACDONALD: My man Jed gets out of jail, calls me up, hits me up with his other fifteen thousand, and then I'm a happy man. Right? Ten apiece, right?
>
> "DEFENDANT: Right. . . .
>
> "DETECTIVE MACDONALD: Ok. I just need the five though bro.
>
> "DEFENDANT: Ok."

We cannot agree with our dissenting colleagues that "[t]here is no interpretation of the prosecution's evidence other than that the defendant engaged in conspiracy and solicitation to commit contract killings, and possessed the requisite element of intent." To the contrary, we view this exchange, and others like it on the tapes, as fully consistent with the defendant's claim, supported by the testimony of the correction officers, that he was merely pretending to go along with the "hit men" out of fear of the informant, secure in the knowledge, as confirmed by the detective in the telephone conversation, that, so long as he made no payments to the "killers," no action would be taken against the alleged targets.

Nevertheless, although the evidence of guilt was far from compelling, we cannot conclude that it was legally insufficient to support the conviction, or that the verdict the jury chose to return was against the weight of the evidence (cf. People v Danielson, 9 NY3d 342 [2007]). We do believe, however, that the nature of the evidence, and the conflicting interpretations that can reasonably be given to it, provide an appropriate context in which to evaluate the defendant's claims of trial errors.

■ Although the People offered no tape recording of the defendant ever saying that he wanted the alleged targets killed, and no testimony by the two undercover officers that either one ever heard the defendant actually make such a statement, the court permitted the People, over a hearsay objection, to elicit from Detective MacDonald the substance of his initial conversation with the informant. According to the detective, the

informant told him that "he had a conversation with another individual, later known as Jed Kass [the defendant], who stated to him that if he knew anybody that would be able to kill—eliminate two people." The detective continued: "Like I said, the conversation that we had was that he inquired—[the defendant] supposedly asked the informant if he knew anybody that would be willing, for money, to murder two people." The prosecutor argued, and the court found, that this testimony was admissible for the nonhearsay purpose of proving the detective's state of mind (see *People v Reynoso*, 2 NY3d 820 [2004]; *People v Dean*, 41 AD3d 495 [2007]; *People v Leftenant*, 22 AD3d 603 [2005]). We agree that the trial court had the discretion to receive this testimony, not for its truth, but to provide background information as to how and why the police pursued the investigation and made contact with the defendant (see *People v Tosca*, 98 NY2d 660 [2002]). But, because this was the only evidence in the entire case that had the defendant expressing a desire to hire people to kill the witnesses, there was a real danger that, without proper guidance, the jury would take the testimony as proof that the defendant actually had made the statement, thereby establishing the decisive element of his intent (see *People v Forbes*, 203 AD2d 609, 610-611 [1994]). It therefore was essential that the court deliver a strong limiting instruction cautioning the jury that the testimony was offered solely for the purpose of explaining why the police did what they did and that it was not to be considered as any evidence that the defendant actually made any such statement to the informant. The court did not give the jury a limiting instruction, however, and that failure was serious and prejudicial error (see *People v Perez*, 9 AD3d 376 [2004]; *People v Roll*, 1 AD3d 617 [2003]; *cf. People v Rivera*, 96 NY2d 749, 751 [2001]).

Later in the trial, the defense called Antonio Cruz, a fellow inmate whom the defendant described as "the one guy that sort of stuck up for [him]" in prison. Cruz's testimony was intended in part to counter a central premise of the prosecution's case that the defendant had simply approached the informant, knowing him only as another prisoner, and asked whether he could put him in contact with someone who would murder two people for money. After Cruz testified that the defendant never told him that he wanted to have any witnesses hurt or killed, defense counsel asked him: "Was there any word around Rikers Island that [the defendant] was looking to have somebody killed?" The prosecutor objected on the ground that the ques-

tion called for a hearsay response, and the court sustained the objection. This was error.

Hearsay is evidence of a statement, whether oral, written, or conveyed through intentional nonverbal conduct, that (1) was made other than by a witness while testifying at the proceeding at which the evidence is offered; (2) has a content that can be characterized as true or false; and (3) is offered in evidence to prove the truth of its contents (*see People v Caviness*, 38 NY2d 227, 230 [1975]; *see also* 5 Wigmore, Evidence § 1361 [Chadbourn rev 1974]; Prince, Richardson on Evidence § 8-101 [Farrell 11th ed]). Evidence of a statement offered not to prove the truth of its contents but only to prove that the statement was made is not hearsay (*see People v Ricco*, 56 NY2d 320, 328 [1982]; *People v Mertens*, 97 AD2d 595, 596 [1983]). Cruz was asked whether he had heard "any word around Rikers Island" that the defendant was attempting to have someone killed. This question simply asked Cruz to testify as to whether he personally had heard such a statement uttered, and therefore did not call for a hearsay response (*see People v Ricco*, 56 NY2d at 328). The court's contrary ruling was erroneous and prejudicial because it precluded the defense from supporting its argument that, if the inmate closest to the defendant never heard him say that he wanted to hire contract killers and never heard "any word around Rikers Island" that he wanted to do so, it was unlikely that the defendant had simply approached the informant, a fellow inmate who was a stranger to him, to ask whether he could arrange a murder-for-hire.

Moreover, in the course of his own testimony, the defendant recounted a conversation during which the informant described himself as "a very big drug dealer in Washington Heights." The prosecutor again objected, maintaining that the testimony was "completely hearsay." Although defense counsel argued that it was "very important what this person said to [the defendant] and how this person acted towards him that induced him into making these telephone calls," the court sustained the prosecutor's hearsay objection. This too was error.

Whether the informant was, in fact, "a very big drug dealer in Washington Heights" was, of course, entirely irrelevant to the issues at the defendant's trial. But, given the defendant's testimony that he had met and spoken with the "hit men" only out of fear of the informant, what the defendant thought about the informant was an essential part of the defense. Thus, the informant's boast about being "a very big drug dealer in

Washington Heights," although not relevant for its truth, was very relevant for the effect its utterance may have had in contributing to the defendant's fear of the informant (*see People v Minor*, 69 NY2d 779, 780 [1987]). Evidence of a statement offered not for the truth of its content but for the effect of its utterance is not hearsay (*see People v Jordan*, 201 AD2d 961 [1994]). The court's erroneous ruling here excluded evidence directly relevant to the defendant's state of mind, the central issue in the case.

■ The court further erred in refusing to give the jury a missing witness charge with respect to the informant. At the outset of the trial, the defendant included the informant on his witness list, but apparently expected the prosecution to call him. The People did not call the informant, however, and, at a break in the defense case, when the court asked the parties for requests to charge, defense counsel addressed the court as follows:

> "Your Honor, I would request [a] missing witness charge as to the registered confidential informant who set up this whole proceeding. I have no idea where he is. He is a registered informant with the police department. He . . . befriended my client and put my client in touch with the people that were supposedly 'his people' who were going to help my client out with money and/or ultimately this talk about taking care of witnesses and killing witnesses.

> "He has not testified here. I think his testimony is important. As I said, he is a registered informant for the police department. They would or should know where he is, and we have heard nothing about him at all."

The prosecutor opposed the request, arguing that the informant was not under his control. He revealed that the informant had been released from Rikers Island and that the People "had made no . . . efforts to contact [him]." Defense counsel observed that "the problem here is that the Court allowed Detective MacDonald to get on the stand and say that he was informed by [the confidential informant that he] heard that my client was looking around for somebody to kill some witnesses. That was hearsay that came through from Officer Mac-Donald; unfortunately, we don't have [the informant] here to say." The court interrupted counsel and ultimately reserved decision, directing the prosecutor to provide the defense with the informant's last known address.

At the conclusion of the defendant's case, the court revisited the issue of a missing witness charge. The prosecutor again opposed the application, arguing:

> "One, I submit to the Court that it was an untimely request because it was made after the People rested, and after—actually, at the time that the defendant already started the case.
>
> "Secondly, that witness is not or had not been in the control of the People.
>
> "I had given the phone number and the address of that witness to defense; and as a matter of fact, when I—that same day, I had looked up that address using my computer system, and came back to another individual. And that phone number that I had already submitted to counsel, that came also back to another individual, according to my checks.
>
> "Now, the third thing is that particular witness was put on the defense witness list, so I mean under those circumstances, I would say that a missing witness charge would not be appropriate."

The prosecutor confirmed that the People had "lost all contact" with the informant since his release from prison only a few months after the defendant's arrest. Asked what efforts he had now made to locate the informant, the prosecutor replied:

> "Well, like I said, the information that the address—I did computer checks, as far as that particular address, and it came back to a different individual . . .
>
> "The number that we had on file for [the informant] was 777-[59x], and according to my computer check, it came back to a different—like a reverse directory. It came back to a totally different address of [59x] Broadway. And came back to a first name as X-I-A-O-Y-U-N Q-I-N-G.
>
> "And I called that number. I had begun trying to call that number, and the best that I could do was get a machine, which sounded like a Chinese female, but she never gave me a callback.
>
> "Now, as far as the address that we had for [the informant] was [xx-xx] Newton Avenue. I did a com-

puter check on that address, and it came back to a David Agudo . . . at 267-[59x], and a totally different person.

"Now, what I had also done, there was a business number on the CJA sheet. There was a business phone number for him. I think it was some sort of shoe store down in Manhattan. I called that and asked them if they ever knew this fellow back when he gave this information to the [CJA]. The guy said he never knew the guy; never heard of him; he is not there now."

The court denied the application for a missing witness charge. Under the circumstances of this case, that was error.

After the People rested, the defendant produced evidence in support of his position that the confidential informant had coerced him into speaking with the hit men. On the witness stand, Detective MacDonald essentially agreed that the informant was "right there" or "nearby" the defendant during every telephone conversation the detective had with him, and the tapes essentially confirm that impression. Needless to say, the police witnesses could not testify as to what went on between the informant and the defendant at Rikers Island. Clearly, then, the defendant showed that the informant was knowledgeable about the principal issue in the case, and that he could provide firsthand, noncumulative testimony on that issue. Moreover, the law assumes that a confidential informant who plays a major role in the events leading to a defendant's arrest would, if called, testify favorably to the prosecution and adversely to the defendant (see *People v Gonzalez*, 68 NY2d 424, 429-430 [1986]; *People v Dillard*, 96 AD2d 112, 112-113 [1983]; *People v Alamo*, 63 AD2d 6, 7-8 [1978]). Once the defendant presented prima facie evidence that the confidential informant was knowledgeable about a material issue in the case and would be expected to give noncumulative testimony favorable to the prosecution, the burden shifted to the People to account for the informant's absence (see *People v Macana*, 84 NY2d 173, 177 [1994]; *People v Kitching*, 78 NY2d 532, 537 [1991]; *People v Gonzalez*, 68 NY2d at 428). Here, the People essentially made two arguments in opposing the defendant's application. First, they argued that the informant was unavailable to them because they did not know his whereabouts and were unable to locate him. Second, they argued that, in any event, the request for the missing witness charge, made after the People had rested and the defense case had begun, should be denied as untimely.

A request for a missing witness charge should be made "as soon as practicable so that the court can appropriately exercise its discretion and the parties can tailor their trial strategy to avoid substantial possibilities of surprise" (*People v Gonzalez*, 68 NY2d at 428 [internal quotation marks omitted]; *see People v Davis*, 48 AD3d 1255, 1256 [2008]). Here the request was made as the defense case, raising questions about the nature of the informant's conduct, began. The court had more than enough time to exercise its discretion, and, in fact, postponed its decision until the close of evidence. Moreover, there was no substantial possibility that the prosecutor was actually surprised by the request so as to be unable effectively to tailor his trial strategy (*see People v Robertson*, 205 AD2d 243, 245-246 [1994]). The informant was at the heart of this case from its inception. And, in any event, inasmuch as the prosecutor maintained that the People had lost all contact with the informant after his release from prison and were unable to locate him, they clearly suffered no prejudice as a result of the timing of the defendant's application. The prosecutor did not suggest that, had the request been made before the People rested rather than after, he likely would have been more successful in locating and producing the informant. Thus, under the circumstances of this case, the defendant's request for a missing witness charge was not properly denied as untimely (*see People v Badine*, 301 AD2d 178, 181-182 [2002]).

Moreover, this was a registered confidential informant who, according to Detective MacDonald, worked with the police on two separate murder-for-hire investigations, and who was released from prison only a few months after the defendant's arrest. In opposing the defendant's application for a missing witness charge, the prosecutor said nothing about the circumstances of the informant's release or whether the assistance he had given the People played any role in it. The prosecutor represented that the People had lost all contact with the informant following his release, but was never asked how that came to pass or what efforts the People had made to maintain contact with him, at least while the two murder-for-hire cases were pending. Detective MacDonald testified that the informant was registered to a Detective Potapchuk, but the prosecutor made no representation as to whether that detective had any information about the informant's likely whereabouts. Instead, the prosecutor simply stated that, when the issue arose at trial, he made an attempt to locate the informant using address, work,

and telephone information the informant himself had provided. The prosecutor reported that his efforts were unsuccessful because the information was inaccurate—the person contacted at the informant's supposed place of employment, for example, answering that "he never knew the [informant]; never heard of him." Ironically, then, out of the presence of the jury, the People argued in effect that the court should not give a missing witness charge because the informant, a central figure in the case, had lied when providing information as to his address, telephone number, and place of employment.

Without some showing as to the circumstances surrounding the informant's release, the efforts made by the People to maintain contact with him after his release, and any knowledge his controlling detective might have regarding his whereabouts, the People failed to carry their burden of demonstrating the informant's unavailability so as to defeat the defendant's request for a missing witness charge (*see People v Savinon*, 100 NY2d 192, 199 [2003]; *People v Vasquez*, 76 NY2d 722, 724 [1990]; *People v Robertson*, 205 AD2d at 246).

Finally, on the question of preservation, it is true that, although defense counsel vigorously objected to the admission of Detective MacDonald's testimony as to what the informant told him, he did not specifically ask for a limiting instruction after his objection was overruled. Nor did he advance finely honed legal theories to support his proffer of testimony from Cruz regarding the "word around Rikers Island," or the defendant's testimony describing the informant's boast about being "a very big drug dealer in Washington Heights." And, in pressing his request for a missing witness charge, defense counsel did not argue specifically that the prosecution had failed to make diligent efforts to locate the informant for trial. But, even assuming that any or all of these trial errors were unpreserved for appellate review, our Court nevertheless retains the statutory authority to reverse the conviction and order a new trial as a matter of discretion in the interest of justice upon finding that the errors at trial, although not duly protested, deprived the defendant of a fair trial (*see* CPL 470.15 [3] [c]; [6] [a]). It has been aptly said that this power to review and reverse in the interest of justice, although broad, must not be exercised in a "capricious and whimsical" manner but only "in accordance with the conscience of the court and with due regard to the interests of the defendant and those of society" (*People v Kidd*, 76 AD2d 665, 667-668 [1980]). In this case, we cannot in good

conscience escape the conclusion that, had defense evidence been allowed regarding the lack of "word around Rikers Island," and the informant's boast about being "a very big drug dealer in Washington Heights," and had the court delivered both a strong limiting instruction on the informant's reported statement to Detective MacDonald and an appropriate missing witness charge, the jury might well have reached a different determination as to whether the defendant, now serving a term of imprisonment of 10 to 20 years, had been proven guilty beyond a reasonable doubt. Accordingly, because the trial errors, although largely unpreserved as questions of law, deprived the defendant of a fair trial, we reverse the judgment, on the law and as a matter of discretion in the interest of justice, and remit the matter to the Supreme Court, Queens County, for a new trial (*see People v Jones*, 51 AD3d 690 [2008]; *People v Washington*, 278 AD2d 517, 518 [2000]; *People v Boyd*, 256 AD2d 350, 350-351 [1998]).

DILLON, J. (dissenting). The defendant was incarcerated awaiting trial on a grand larceny charge when the police received information from a confidential informant that the defendant was looking for a "hit man" to murder two individuals expected to testify at the defendant's impending trial. The police commenced an investigation in which the defendant was led to believe that he was hiring an associate of the informant to kill the two prospective witnesses for money.

During the investigation, the police recorded several phone conversations between the defendant and Detective James Mac-Donald, who pretended to be an associate of the informant. The police also obtained a recording of a conversation between the defendant and Detective Duane Shepard, who posed as a "hit man" visiting the defendant in prison to discuss business. The defendant was convicted of conspiracy in the second degree and criminal solicitation in the second degree.

The defendant challenges the admission into evidence of the recordings of his conversations with undercover police investigators. As the People concede, a proper foundation was not laid for exhibit 8, the recording of a conversation between the defendant and Detective Shepard at the prison (*see People v Ely*, 68 NY2d 520, 527 [1986]; *People v McGee*, 49 NY2d 48, 60 [1979], *cert denied* 446 US 942 [1980]). However, since the substance of that recorded conversation was placed on the record through Detective Shepard's testimony, any error in admitting the recording was harmless (*see People v Blanco*, 162 AD2d 540, 544 [1990]).

Furthermore, the defendant failed to preserve his challenge to the admission of the other recordings dated January 17, 2003, and to both of the recordings dated January 21, 2003 (*see* CPL 470.05 [2]; *People v Gray*, 86 NY2d 10, 19-20 [1995]). In any event, the trial court providently exercised its discretion in admitting into evidence each of the recorded conversations between the defendant and Detective MacDonald. Contrary to the defendant's contention, the People laid a proper foundation for the admission of those recordings (*see People v Gibbons*, 18 AD3d 773 [2005]). Additionally, there was no real danger that the factfinder would be left to speculate as to what transpired during any inaudible segments of the tapes, since there were independent sources to describe the conversations (*see People v Harrell*, 187 AD2d 453 [1992]; *People v Morgan*, 175 AD2d 930, 932 [1991]).

The defendant challenges the admission into evidence of the testimony of Detective MacDonald that he had been contacted by an informant who stated that the defendant was seeking to have two people killed for hire. The court admitted the testimony not for its truth, but to establish the detective's state of mind in launching an investigation. The defendant's arguments that the admitted testimony violated his constitutional rights to due process, to present a defense, and to confront witnesses, are not preserved, as no objections were interposed at trial on constitutional grounds (*see* CPL 470.05 [2]; *People v Robinson*, 41 AD3d 1183, 1184 [2007]; *People v Johnson*, 40 AD3d 1011, 1012 [2007]).

In any event, the detective's testimony was properly admitted into evidence as relevant to the detective's state of mind (*see People v Dean*, 41 AD3d 495, 496 [2007]; *People v Johnson*, 40 AD3d at 1012; *People v Leftenant*, 22 AD3d 603, 604-605 [2005]). Contrary to the defendant's contention, the People did not rely on the statement of the informant for its truth in establishing guilt. The informant was mentioned in their opening statement only to explain how and why an investigation was undertaken and was never mentioned in the People's closing argument. Moreover, the People's evidence of the truth was the conversational res of the crimes themselves. According to Detective Shepard and as confirmed by certain admissible tape recordings, the defendant discussed criminal conduct with Detective Shepard toward two individuals who were specifically identified as persons scheduled to testify against the defendant at another criminal proceeding. One prospective victim was described as

Italian, white, driving a blue Bentley, while the other prospective victim was described by the defendant as Italian, weighing 400 pounds and driving a silver Lexus. The defendant identified the victims' work location and the time of day they arrive at work. The defendant and Detective Shepard negotiated a price and discussed the means and method of payment, and the method by which the performance of the crimes could thereafter be confirmed to the defendant. The conversations included, inter alia, the defendant's affirmative agreement with Shepard that the victims be "taken care of," that one victim will get "two in his head" and the other taken some place to "put him out" in ways to make them look like victims of random crime, and that the defendant's "problems are going to be eliminated." The police made efforts during recorded conversations to assure that the defendant was "100 percent sure" of what he wanted done and was not merely "angry at the moment." There is no interpretation of the prosecution's evidence other than that the defendant engaged in conspiracy and solicitation to commit contract killings, and possessed the requisite element of intent (*see* Penal Law §§ 105.15, 100.10).

In light of the defendant's affirmative agreement with Detective Shepard that the witnesses be killed, we disagree with the majority's belief that Detective MacDonald's testimony is the only evidence of the defendant's criminal expressions of a desire and intent to arrange killings for hire. As the jury accepted Detective Shepard's testimony as corroborated by certain tape recordings, any failure by the trial court to provide a limiting instruction regarding Detective MacDonald's testimony of his conversations with the defendant, if error at all, is harmless (*see People v Moses*, 35 AD3d 766, 767 [2006]).

To the extent the defendant testified that he was pressured to speak with "hit men" as to negate the requisite element of intent, there is nothing in the record to suggest that the jury failed to consider the defendant's testimony. Indeed, the jury, in reaching its verdict, rejected it.

Similarly, the defendant's argument that his hearsay testimony that the informant was "a very big drug dealer in Washington Heights" was improperly excluded, as relevant to his own state of mind and fear of the informant, is unpreserved for appellate review as his state of mind argument is made for the first time on appeal (*see* CPL 470.05 [2]; *People v Sostre*, 51 NY2d 958, 960 [1980]; *People v Oguendo*, 305 AD2d 140, 141 [2003]). Furthermore, we disagree with the majority that the

court erred in not allowing the question posed to defense witness Antonio Cruz as to whether there was "any word around Rikers Island that [the defendant] was looking to have somebody killed?" In our view, the Court properly sustained the prosecutor's objection to the question on hearsay grounds. While the majority views the question as merely focusing upon whether Cruz "heard such a statement uttered," no extended analysis is needed to conclude that the purpose of the question was to elicit an answer in the negative, thereby supporting the defendant's contention that he was not attempting to have someone killed. Contrary to the majority's conclusion, the query to Cruz constituted hearsay inasmuch as it was offered for the truth of the facts asserted, namely, that there was no word around Rikers Island that the defendant was attempting to arrange a murder for hire (*see generally People v Robles*, 38 AD3d 1294 [2007] [trial court properly excluded as hearsay the testimony of several witnesses that they heard another witness repeat a remark allegedly made by the victim]).

Contrary to the majority's determination, the defendant was not entitled to a missing witness charge. The argument on appeal that the prosecution failed to make diligent efforts to locate the informant for trial, after the informant had been released from incarceration, is unpreserved for appellate review (*see* CPL 470.05 [2]; *People v Lopez*, 19 AD3d 510, 511 [2005]; *People v Simon*, 6 AD3d 733 [2004]; *People v Mazyck*, 287 AD2d 654, 655 [2001]; *People v Porter*, 268 AD2d 538 [2000]). Moreover, the request for a missing witness charge, made during the defense case and well after Detective MacDonald's testimony, was untimely (*see People v Woods*, 275 AD2d 332 [2000]). In any event, on the merits, the People established that the informant was unavailable to testify at trial as his whereabouts were unknown despite diligent efforts to locate him (*see People v Gonzalez*, 68 NY2d 424, 427-428 [1986]; *People v Sealy*, 35 AD3d 510 [2006]). We reject our colleagues' view that the release of the informant from incarceration, months before the defendant's trial, satisfied the factors otherwise required for a missing witness charge (*see generally People v Gonzalez*, 68 NY2d 424 [1986]; *People v Vanhoesen*, 31 AD3d 805, 809 [2006]).

Since the defendant was afforded "meaningful representation" at trial, the argument that his counsel was ineffective must fail (*see People v Benevento*, 91 NY2d 708, 712 [1998]).

The defendant's remaining contentions are without merit.

PRUDENTI, P.J., and McCARTHY, J., concur with FISHER, J.; DILLON and SKELOS, JJ., dissent and vote to affirm the judgment in a separate opinion by DILLON, J.

Ordered that the judgment is reversed, on the law and as a matter of discretion in the interest of justice, and the matter is remitted to the Supreme Court, Queens County, for a new trial.