THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RAMON ESTEVES, Appellant.

Second Department, December 11, 1989

APPEARANCES OF COUNSEL

*Scott N. Singer* for appellant.

*Elizabeth Holtzman, District Attorney (Barbara D. Underwood, Ann Bordley* and *Jonathan Svetkey* of counsel), for respondent.

### OPINION OF THE COURT

RUBIN, J.

On this appeal, the defendant argues, *inter alia,* that his

guilt was not established beyond a reasonable doubt and that the trial court erred in refusing to admit into evidence an exculpatory, nonverbal statement made by the wounded victim approximately 13 hours after the shooting and six days prior to his demise. The defendant was charged with acting in concert with another unapprehended person in the commission of the crimes, *inter alia,* of murder in the second degree, the lesser included offense of manslaughter in the first degree, and reckless endangerment in the first degree, arising from two separate incidents. At the defendant's trial, the following facts were adduced by the prosecution.

On the evening of August 23, 1983, a short time after the complainant Armando Santiago and the defendant had a verbal confrontation in front of Santiago's residence, the defendant returned to the scene with a male companion, who had a scar on his face. The latter carried a baseball bat. When the defendant displayed a revolver, a friend of Santiago pushed Santiago into the hallway of the apartment house and they took cover behind the stairs. The defendant fired one shot at Santiago, but missed. Subsequently, a police detective observed a bullet hole in the siding below the steps leading to the upstairs apartments and removed a misshapen piece of lead, which was discarded after the officer was informed that it had no ballistics value.

The following evening, August 24, 1983, Santiago walked to the corner of Wilson and Madison Avenues and met the defendant and the man with the facial scar. Santiago had on numerous prior occasions spoken with the defendant and the man with a scar as they stood outside the neighborhood club, located on this corner. Santiago asked the defendant why he had shot at him. The defendant replied that his girlfriend had advised him that Santiago had a gun. The man with a scar stated that if he had known Santiago had a gun, he would have killed him. Santiago's stepsister Julia then walked over to the group and began to argue with the man with a scar. Ramon Vincente, Santiago's cousin, interceded and instructed the man with a scar not to argue with Julia, because she was his woman. The man with a scar asked Vincente if he was tough. Vincente replied that there was no problem. The man with a scar then walked a few feet away from the group and stood beside the wall of the neighborhood club. The man with a scar next opened his shirt and pulled out a gun. The defendant, who was standing closer to the curb only a few feet in front of Vincente, also took out a gun. Both men started

shooting at Vincente. The man with a scar fired four times and the defendant fired three times. Neither Santiago nor Vincente were armed with a gun. Vincente fell onto the sidewalk, holding his neck. As the man with a scar ran towards Wilson Avenue, he continued to fire a couple of shots in the direction of Vincente. The wounded Vincente told Santiago to leave so that he would not be injured. The defendant was also hit by a bullet, but Santiago did not know how the defendant sustained his injury.

Santiago's testimony regarding the shooting of his cousin was corroborated by the testimony of another eyewitness, Nieves, who was sitting on a stoop directly across the street from the corner where the incident took place. On prior occasions, Nieves had seen the defendant and the man with a scar standing in front of the club. He also knew Santiago and Vincente from the neighborhood. After hearing a loud argument, the witness observed the defendant and the man with a scar holding guns and shooting at Vincente. Several shots were fired and Vincente fell to the ground. Nieves did not see anyone else with a gun. On the sidewalk beside the wounded Vincente was a baseball bat. The witness did not know how the defendant was wounded in the incident, but he also observed the man with a scar run towards Wilson Avenue while continuing to fire his gun.

Vincente was hospitalized for his injury. The bullet had severed his spinal cord, rendering Vincente a quadriplegic. Vincente died on August 31, 1983, one week after he had been shot, from bronchopneumonia, a complication resulting from his gunshot wound.

The defendant testified at his trial. Although admitting that he had a physical confrontation with Santiago on August 23, 1983, the defendant denied possessing or firing a gun that evening. According to the defendant, the next night he saw five people arguing on the corner in front of the club where he is employed, including Santiago, Vincente and a man with a scar named Franscisco. When he approached the corner, Santiago put his arm around the defendant's shoulder. The defendant shrugged off Santiago's arm and walked away from the crowd when his fiancée called him from the door of her residence. As he walked in the direction of her house, the defendant heard shooting and felt a pain in his side. The defendant denied that he either possessed or fired a weapon on the evening of August 24. The defendant conceded that he had a prior conviction for criminal possession of stolen prop-

erty. Two other witnesses to the August 24 shooting were called to testify for the defense. Upon hearing gunshots on the corner of Madison and Wilson Avenues, each defense witness looked in that direction and saw the defendant holding his side as he ran from the corner. Neither witness saw who fired the shots.

■ Viewing the evidence in the light most favorable to the prosecution *(see, People v Contes,* 60 NY2d 620), we find it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt of acting with another in the commission of the crimes of manslaughter in the first degree, with regard to the homicide of Ramon Vincente, and reckless endangerment in the first degree, with regard to the bullet fired at Armando Santiago on August 23, 1983. The prosecutor's two eyewitnesses, Santiago and Nieves, identified the defendant, who each knew from the neighborhood, as one of the two gunmen firing shots at Vincente in the aftermath of a heated argument. Rejecting as incredible the defendant's portrayal of himself as a wounded bystander, a rational trier of fact could have readily found that the defendant was wounded by a stray bullet fired by his scar-faced accomplice based on evidence as to the position of the participants at the time the shooting commenced and the fact the scar-faced accomplice continued to fire his weapon as he fled in the direction of Wilson Avenue. Santiago additionally identified the defendant as the man who fired a shot at him, but missed, on the previous evening. This testimony was corroborated by a piece of lead removed from a bullet hole from the steps Santiago hid behind when the shot was fired.

Moreover, upon the exercise of our factual review power, we are satisfied that the verdict was not against the weight of the evidence *(see,* CPL 470.15 [5]). Insofar as the defendant's argument focuses upon alleged inconsistencies in the prosecution witnesses' trial testimony and their prior statements to the police, we note that minor discrepancies, as here, do not render the challenged testimony incredible as a matter of law *(see, People v Di Girolamo,* 108 AD2d 755). The question of credibility was properly presented to the triers of fact, and we perceive no basis for disturbing their resolution of this issue *(see, People v Harris,* 133 AD2d 649, 651; *People v Wadley,* 133 AD2d 239, 240; *People v Smith,* 124 AD2d 839, 840; *People v Russo,* 118 AD2d 740; *People v Garafolo,* 44 AD2d 86, 88). Contrary to the defendant's contention, we find his guilt was established by overwhelming evidence.

██ ██ We also reject the defendant's contention that the trial court erred in ruling that the deceased victim's exculpatory declaration was not admissible as either a dying declaration or excited utterance. At the trial, the defendant sought to elicit the fact that approximately 13 hours after the shooting Detective Sescilia went to the hospital where Vincente was being treated for his wounds, showed the victim a photograph of the defendant and asked: "Is this the person who shot you?" Vincente, who could not speak, shook his head to indicate no.

Vincente's nonverbal statement constituted hearsay evidence, as it was made out of court and was sought to be introduced for the truth of what he asserted (see, People v Nieves, 67 NY2d 125, 131; People v Edwards, 47 NY2d 493, 496; see also, People v Caviness, 38 NY2d 227, 230; Richardson, Evidence § 200 [Prince 10th ed]). Consequently, the statement was admissible only if the defendant demonstrated that it fell within one of the exceptions to the hearsay rule.

██ Dying declarations have long been treated as an exception to the general rule excluding hearsay evidence (see, People v Becker, 215 NY 126, 145; Richardson, Evidence § 311 [Prince 10th ed]). In the usual case, the dying declaration incriminates the defendant and, hence, is received against him at trial. However, if the dying declaration exculpates the defendant, it is admissible on his behalf (see, 5 Wigmore, Evidence § 1452; 2 Wharton's Criminal Evidence §§ 324, 317 [14th ed]; McCormick, Evidence § 261; Richardson, Evidence § 311 [Prince 10th ed]). When the defendant seeks to have admitted into evidence a dying declaration, he is required to lay the same foundation as is demanded of the prosecution (see, e.g., Mattox v United States, 146 US 140, 151; Commonwealth v Bednorciki, 264 Pa 124, 107 A 666; see, Richardson, Evidence § 311 [Prince 10th ed]; see also, People v Gonzalez, 54 NY2d 729). "[F]or a statement to constitute a dying declaration, the declarant must not only have been in extremis [as here], but must also have spoken under a sense of impending death, with no hope of recovery" (People v Nieves, 67 NY2d 125, 132, supra; see, People v Ludkowitz, 266 NY 233, 239; People v Sarzano, 212 NY 231, 235; People v Del Vermo, 192 NY 470). The requisite state of mind of the declarant must be more than a belief that death is possible or even probable. "There must be 'a settled hopeless expectation' * * * that death is near at hand" (Shepard v United States, 290 US 96, 100 [Cardozo, J.]). In the instant case, there was insufficient evidence that Vincente made the nonverbal statement while

"under a sense of impending death, with no hope of recovery" *(People v Nieves, supra,* at 132). Although the bullet had severed Vincente's spine, rendering him a quadriplegic, he died six days after he made the nonverbal statement. The defendant proffered no proof that Vincente had communicated, in some manner, to either the detective, hospital personnel, family or friends, an expectation of imminent death. Notably, there was no evidence of statements made by medical personnel to Vincente regarding the nature and severity of his wound *(see, People v Nieves, supra,* at 134). Here, the circumstances were insufficient to infer the requisite state of mind.

The defendant argues, for the first time on appeal, that Vincente's nonverbal statement should have been admitted as an excited utterance. Statements within this long recognized exception to the hearsay rule generally have been made contemporaneously or immediately after a startling event which affected or was observed by the declarant, and relate to the event *(see, People v Nieves, supra,* at 135; *People v Edwards,* 47 NY2d 493, 496-497, *supra).* The essential element of this exception is that the declarant spoke while under the stress or influence of the excitement caused by the event, so that his reflective capacity was stilled *(People v Nieves, supra; see, People v Caviness,* 38 NY2d 227, 230-231, *supra; People v Marks,* 6 NY2d 67, 71). A determination as to whether Vincente's nonverbal statement qualified as an excited utterance requires factual determinations dissimilar to those surrounding the issue of dying declarations. At the hearing before the trial court, outside the presence of the jury, defense counsel made no effort to have the statement admitted as an excited utterance and, thus, the People never had an opportunity to counter the factual theory now advanced by the defendant in support of the admissibility of this evidence. Consequently, the issue has not been preserved for appellate review *(cf., People v Nieves, supra,* 135-136). In any event, we conclude that the nonverbal statement, made in response to questioning 13 hours after the shooting, does not constitute an excited utterance *(cf., People v Brown,* 70 NY2d 513).

Nor was Vincente's exculpatory statement admissible as an admission against interest as urged by defense counsel at trial. " 'In the prosecution of criminal offenses the state does not assert a private right, or maintain an individual interest, in any such sense as to be affected or bound by hearsay statements of him who has been the victim or object of the

criminal act. There is no such legal identity or privity between the person so situated and the state as to render admissions made by him competent evidence in behalf of the party charged with the commission of the crime' " *(Commonwealth v Bednorciki,* 264 Pa 124, 127, 107 A 666, 667, *supra).*

Next, the defendant argues that even if Vincente's exculpatory statement does not specifically fall within an exception to the hearsay rule, it bore substantial guarantees of trustworthiness and was critical to his defense. Therefore, he had a due process right to introduce Vincente's exculpatory statement into evidence and its exclusion deprived him of a fair trial.

■ Recently, the Court of Appeals expressed its reluctance "to abandon the well-established reliance on specific categories of hearsay exceptions in favor of an amorphous 'reliability' test, particularly in criminal cases where to do so could raise confrontation clause problems" *(People v Nieves, supra,* at 131). However, in this case, the Confrontation Clause of the Federal and State Constitutions (US Const 6th Amend; NY Const, art I, § 6) are not implicated since the defendant, not the State, is seeking to introduce the challenged testimony. Moreover, there is authority for finding that the exclusion of exculpatory hearsay statements may result in the denial of the defendant's right to a fair trial, in violation of due process, where the statement was critical to the defendant's defense and bore substantial assurances of trustworthiness, albeit it was not admissible upon the basis of any exception recognized by the State's rules of evidence *(see, Chambers v Mississippi,* 410 US 284; *People v Gonzalez,* 54 NY2d 729, *supra; People v Arnold,* 34 NY2d 548; *People v Brown,* 26 NY2d 88; *Letendre v Hartford Acc. & Indem. Co.,* 21 NY2d 518; *People v Ortiz,* 119 Misc 2d 572; *see also,* Fed Rules Evid, rule 804 [b] [5]; Proposed NY Code of Evidence § 804 [b] [1982]). For example, in *Chambers v Mississippi (supra),* Mississippi's rules of evidence did not recognize as a hearsay exception statements made against penal interests. The United States Supreme Court concluded that under the unique circumstances of that case, the defendant Chambers had been deprived of due process by the trial court's exclusion of Mr. McDonald's hearsay confessions to the murder for which the defendant was on trial. The Supreme Court stressed the fact that McDonald's hearsay statements were critical to the defendant's defense and bore substantial assurances of trustworthiness, as evidenced by the facts that each confession was made spontaneously to a close

acquaintance, each was corroborated by other evidence in the case, each was in a real sense against McDonald's interest, and McDonald was present and available for cross-examination by the State. In sum, the aforenoted authorities recognize that, in certain instances, an exculpatory hearsay statement which does not fall within the specified categories of hearsay exceptions may be admissible *provided the statement is critical to the defense and is otherwise reliable and trustworthy.* Here, the trial court's evidentiary ruling, denying the admission of Vincente's nonverbal statement, does not constitute error because, contrary to the defendant's contention, the statement was not critical to the defense and lacked the requisite indicia of reliability and trustworthiness.

In this case, there was overwhelming evidence that both the defendant and his scar-faced companion possessed a gun and fired their respective weapons at Vincente. No other firearms were observed during the incident by any eyewitness. Although none of the eyewitnesses was able to identify which of the two men actually shot Vincente, this issue was irrelevant because the defendant had been charged with acting in concert with the scar-faced gunman in the shooting death of Vincente. Even if the scar-faced gunman fired the fatal shot, the defendant's status as an accomplice made him criminally liable for his companion's conduct *(see,* Penal Law § 20.00). The proof clearly established that the defendant possessed the requisite mental culpability required for the commission of the offense of manslaughter in the first degree (the intention to cause serious physical injury) and aided in its commission. Since there was no distinction, under the facts of this case, between liability as a principal and criminal culpability as an accessory *(see, People v Duncan,* 46 NY2d 74, 79-80, *cert denied* 442 US 910), Vincente's nonverbal statement, which exculpates the defendant from having discharged the fatal shot, was not critical to the defense.

Furthermore, the facts and circumstances in the case at bar do not support a finding that Vincente's nonverbal statement bore substantial assurances of trustworthiness. Unlike the declarant in *Chambers (supra),* here the deceased Vincente is no longer available as a witness. His statement is to be regarded with a degree of skepticism because it was made with no fear of prosecution for perjury and without the test of cross-examination—the best method known to bring out the full and exact truth *(see, People v Falletto,* 202 NY 494, 499). Since there is no proof that Vincente responded to the detec-

tive's inquiry under a sense of impending death, it cannot be presumed that the psychological effect such awareness has on the declarant removed from his mind all motivation and inclination to lie (see, People v Nieves, 67 NY2d 125, 132, supra, citing 5 Wigmore, Evidence § 1443 [Chadbourn rev]; Prince, Policy Considerations and Changes in the Hearsay Rule, 19 NYL Forum 761, 763; accord, People v Bartelini, 285 NY 433, 439). Nor can one assume that Vincente had no reason to falsely exculpate the defendant. The instant record would support a finding that Vincente was concerned about the safety of his cousin and girlfriend and had reason to fear the defendant and his scar-faced companion, based on their prior hostile acts. Thus, a reasonable inference can be drawn that Vincente may have refused to inculpate the defendant because he feared retribution from the defendant's unapprehended accomplice. Clearly, Vincente's response to the detective's inquiry was not made as a "direct result of sensory perception during that brief period when considerations of self-interest cannot be immediately brought to bear"—the indicia of trustworthiness that justifies the admission of excited utterances into evidence (see, People v Edwards, 47 NY2d 493, 497, supra).

Most noteworthy is the absence of evidence in this case to corroborate Vincente's nonverbal statement. When presented with a photograph of the defendant, the detective asked the wounded Vincente: "Is this the person who shot you?" The question is ambiguous because the evidence at trial established the fact that two men simultaneously fired their guns at Vincente. By nodding to indicate "no", was Vincente stating that the defendant was not involved in the shooting or was he stating that the defendant, although a participant, did not fire the bullet that struck him? Due to the ambiguous nature of the question, Vincente's negative response lacks any indicia of reliability.

Consequently, the trial court's evidentiary ruling was proper. Vincente's exculpatory hearsay statement was not admissible under any of the specific categories of hearsay exceptions. Moreover, its exclusion would not deprive the defendant of his right to a fair trial because this hearsay evidence was neither critical to the defendant's defense nor bore substantial assurances of trustworthiness. In any event, even if the court had erred in its evidentiary ruling that error would have been harmless in view of the overwhelming evi-

dence of the defendant's guilt *(People v Crimmins,* 36 NY2d 230).

We have reviewed the defendant's remaining contentions and find them to be without merit. Accordingly, the judgment is affirmed.

MOLLEN, P. J., KUNZEMAN and EIBER, JJ., concur.

Ordered that the judgment is affirmed.