*584 Appeal by the defendant from a judgment of the Supreme Court, Suffolk County (R. Doyle, J.), rendered January 17, 2007, convicting him of murder in the second degree, upon a jury verdict, and imposing sentence.
Ordered that the judgment is reversed, on the law, and the matter is remitted to the Supreme Court, Suffolk County, for a new trial.
The defendant identifies three significant grounds for reversal of his conviction; to wit: the preclusion, on hearsay grounds, of statements purportedly made by the defendant’s mother; juror misconduct during deliberations; and the summary curtailment of defense counsel’s closing statement.
The trial court erred in precluding the defendant from testifying about a statement which his mother allegedly made to him on the day the decedent was killed concerning how she killed the decedent. The defendant contended that only after his mother made this detailed statement to him did he confess to the police that he had killed the decedent in an effort to protect her. The defendant argued that his testimony as to his mother’s statement would establish his motive to protect his mother by removing evidence from the crime scene and confessing to the police, in addition to explaining his ability to provide accurate details of the crime in his confession. The specific details of the crime contained in the defendant’s confession were not inconsistent with the expert forensic evidence presented to the jury.
The trial court improperly excluded such testimony on the ground that it constituted inadmissible hearsay. It is settled law that “ ‘[t]he mere utterance of a statement, without regard to its truth, may indicate circumstantially the state of mind of the hearer or of the declarant’ ” (People v Cromwell, 71 AD3d 414, *585 415 [2010], quoting Prince, Richardson on Evidence § 8-106, at 502 [Farrell 11th ed]; see People v Stevens, 174 AD2d 640, 641 [1991]).
The right to present a defense is one of the “minimum essentials of a fair trial” (Chambers v Mississippi, 410 US 284, 294 [1973]; see People v Diallo, 297 AD2d 247 [2002]; People v Smith, 195 AD2d 112, 121 [1994]). Under certain circumstances, it encompasses the right to place before the jury secondary forms of evidence, such as hearsay (see Chambers v Mississippi, 410 US at 294). Depriving a defendant of the opportunity to offer into evidence another person’s admission to the crime with which he or she has been charged, even though that admission may only be offered as a hearsay statement, may deny a defendant his or her fundamental right to present a defense (id. at 302; see People v Smith, 195 AD2d at 121; People v Esteves, 152 AD2d 406, 413 [1989]). Moreover, “where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice” (Chambers v Mississippi, 410 US at 302).
Here, the defendant’s testimony as to his mother’s statement was admissible, as it was “not to be elicited for the purpose of establishing the truth thereof, but merely to establish the defendant’s state of mind” upon hearing it (People v Boyd, 256 AD2d 350, 351 [1998]; see People v Davis, 58 NY2d 1102, 1103 [1983]; People v Barr, 60 AD3d 864 [2009]; cf. People v Reynoso, 73 NY2d 816, 818-819 [1988]). The substance and accuracy of the mother’s out-of-court statement is important to the state of mind purpose for which the defendant sought to offer such testimony. Under the defendant’s theory of the case, such testimony established why the defendant confessed and how the defendant knew the exact details of the murder. Therefore, the mother’s statement should not have been excluded (see People v Cromwell, 71 AD3d at 415; People v Kass, 59 AD3d 77, 86 [2008] [“Evidence of a statement offered not to prove the truth of its contents but only to prove that the statement was made is not hearsay”]; People v Jordan, 201 AD2d 961 [1994]; see also People v Boyd, 256 AD2d at 351).
The dissent’s application of the “state of mind” exception to the hearsay rule is more restrictive than controlling precedent otherwise dictates (see e.g. People v Kass, 59 AD3d at 86). Our precedent clearly permits the admission of the statement, but requires the trial court to provide a limiting instruction to the jury as to the use of the statement solely for the purpose of determining the defendant’s state of mind, and not for the purpose of actually establishing the truth of the matter asserted *586 in the statement (see e.g. People v Kass, 59 AD3d at 85 [after properly receiving testimony pursuant to the state of mind hearsay exception, the trial court erred in failing to “deliver a strong limiting instruction cautioning the jury that the testimony . . . was not to be considered as any evidence that the defendant actually made any such statement”]). Thus, the concern that the defendant’s excluded testimony was offered for the purpose of accusing the mother of being the killer could have been allayed by a limiting instruction delivered by the trial court (id.).
Moreover, the dissent relies upon People v Reynoso (73 NY2d 816 [1988]), finding it controlling here. The key factor in Reynoso is that the statement offered by the defendant was made two hours after the crime was committed; thus, it was not offered “to show the declarant’s state of mind at the time the statement was made” (id. at 819 [emphasis added]). Rather, the Court of Appeals found “the only relevanc[e] of defendant’s statement [was] to support his justification defense and establish the past fact of defendant’s prior belief! ]” (id.). That is not the case here. In the present case, the defendant sought to offer a conversation which he had with his mother immediately preceding his removal of evidence from the crime scene, thus defining the defendant’s “then-present” state of mind. The determination in Reynoso is, therefore, not controlling upon the facts in this case.
In addition, the excluded testimony would not have been cumulative of other testimony elicited from the defendant with respect to his state of mind. The admitted testimony alone did not provide the jury with sufficient information to properly evaluate the defendant’s claim that he had been able to accurately describe the killing to the police by relying on details which were conveyed to him by his mother during their conversation (see People v Kass, 59 AD3d at 87; cf. People v Black, 180 AD2d 806, 807 [1992]). The cases relied upon in the dissent do not suggest a different view. Moreover, the evidence of the defendant’s guilt was not overwhelming where no blood was found on the defendant or his clothing, despite the bloodiness of the crime scene, and where the police observed blood on the mother upon responding to the house on the day of the murder. Accordingly, the exclusion of the defendant’s state of mind testimony cannot be viewed as harmless (see People v Minor, 69 NY2d 779, 780 [1987]; People v Boyd, 256 AD2d at 350-351).
We note that the defendant offered the testimony wholly under the state of mind exception to the hearsay rule, with no *587 mention or attempt to admit the testimony as a statement by the mother against her penal interest. In light of this fact, we do not reach the issue of whether the proffered testimony constituted a statement against penal interest, as it is of no moment on this appeal.
A jury verdict may be set aside on the basis of juror misconduct which, inter alia, “may have affected a substantial right of the defendant” (CPL 330.30 [2]; see People v Clark, 81 NY2d 913, 914 [1993]; People v Giarletta, 72 AD3d 838 [2010]). However, “not every misstep by a juror rises to the inherently prejudicial level at which reversal is required automatically” (People v Brown, 48 NY2d 388, 394 [1979]; see People v Irizarry, 83 NY2d 557, 561 [1994]; People v Giarletta, 72 AD3d 838 [2010]). The Court of Appeals has noted that “each case . . . must be examined [on its unique facts] to determine the nature of the [misconduct] and the likelihood that prejudice [was] engendered” (People v Brown, 48 NY2d at 394; see People v Clark, 81 NY2d 913, 914 [1993]).
We conclude that the trial court’s response to evidence of potential juror misconduct during jury deliberations was inadequate to protect the defendant’s right to a fair trial. The defendant properly preserved this issue for appellate review by filing a motion for a mistrial based upon juror misconduct pursuant to Criminal Procedure Law § 330.30.
Several instances of juror misconduct arose during deliberations. The trial court was advised by a member of the jury that juror number 11, who worked as a court officer in another county, was interjecting her professional knowledge into the jury deliberations by voicing certain legal opinions. Although the trial court expressed concern that it did not know “if we got somebody else charging the jury in the back while they are deliberating” and whether a member of the jury had taken “it upon herself to provide her insights as to what jurors can and cannot do during deliberations,” it failed to undertake any further inquiry into the matter before concluding that no misconduct had occurred (see e.g. People v Brown, 21 AD3d 1035, 1035-1036 [2005]; People v Simon, 224 AD2d 458 [1996]). The record is insufficient to eliminate the potential of undue prejudice to the defendant by reason of juror number 11 interjecting her professional expertise into the jury’s deliberation. Under the circumstances, the trial court’s failure to conduct a further inquiry leaves us to speculate as to the extent to which said juror’s expertise was interjected and the degree to which the jury’s deliberations were tainted as a result thereof (see People v Giarletta, 72 AD3d 838 [2010]). Further, juror number ll’s *588 conduct, as outlined in the dissent, underscores the need for the trial court to have made a reasonable inquiry of the jury, which it did not do. On this record, we believe that the conduct of juror number 11 and the trial court’s failure to make adequate, reasonable inquiry into each aspect of juror number ll’s conduct (to wit, threatening that a mistrial would be declared as a result of a fellow juror’s note-taking and juror number ll’s apparent contribution to the characterization of the deadlock charge as an “Allen charge”) leads us to conclude that such unchecked conduct rose to a level such that the defendant’s right to a fair trial was prejudiced.
Finally, we find that the trial court improvidently exercised its discretion when, midway through defense counsel’s summation, it imposed a time limit on the remainder of his summation when no prior limitation had been announced. The closing argument is a basic element of the defense in a criminal trial and the right of defense counsel to make an effective closing argument is impaired when counsel is unjustifiably and without timely warning limited during summation (see People v Middleton, 212 AD2d 809, 811 [1995]; People v Brown, 136 AD2d 1, 16 [1988], cert denied 488 US 897 [1988]), and without any suggestion by the trial court that defense counsel’s summation was redundant or repetitive (see Herring v New York, 422 US 853, 862 [1975]). This right cannot be diluted by the amount of time taken by the prosecution for its summation.
Here, the trial court did not give any advance warning to defense counsel that it would limit the length of his summation (cf. People v Brown, 136 AD2d at 16), and it did not impose a time limit on the prosecutor’s summation (cf. People v Love, 244 AD2d 431 [1997]). Under the circumstances of this lengthy trial, the sudden midclosing imposition of a time limit upon the defense’s summation constituted an unjustifiable limitation which impaired the defense’s right to make an effective closing argument. While the trial court has discretion to limit summations which are repetitive and redundant (see Herring v New York, 422 US 853, 862 [1975]), there is no indication that this was the basis for the limitation of the defense’s closing argument. Rather, it appears from the record that the trial court improperly restricted the defense’s time for summation to defense counsel’s previous estimate of time without warning defense counsel that no further time would be permitted (see People v Middleton, 212 AD2d at 811).
The Court of Appeals defines two standards for nonconstitutional reversible error. Where proof of a defendant’s guilt is not overwhelming, “every error of law (save, perhaps, one of sheer *589 est technicality) is, ipso facto, deemed, to be prejudicial and to require a reversal, unless that error can be found to have been rendered harmless by the weight and the nature of the other proof’ (People v Crimmins, 36 NY2d 230, 241 [1975]; see People v Maldonado, 97 NY2d 522, 530 [2002] [applying this less rigorous standard where proof of defendant’s guilt is not overwhelming]). However, where the proof of guilt is overwhelming, the “error is prejudicial ... if the appellate court concludes that there is a significant probability ... in the particular case that the jury would have acquitted the defendant had it not been for the error or errors which occurred” (People v Crimmins, 36 NY2d at 242; see People v Grant, 7 NY3d 421, 424 [2006]).
The aforementioned errors cumulatively require reversal of the defendant’s conviction. When, as here, proof of a defendant’s guilt is not overwhelming, there is no occasion to apply the harmless error doctrine, and reversal is required (see People v Maldonado, 97 NY2d at 531; People v Bailey, 58 NY2d 272, 278 [1983]; People v Crimmins, 36 NY2d at 241-242). Moreover, even if there were such occasion to apply the rigorous harmless error standard of Crimmins and Grant, “it cannot be said that there is no significant probability that the verdict would have been different absent [the cumulative effect of] these errors” (People v Montoya, 63 AD3d 961, 965-966 [2009]).
In sum, we find the conclusion inescapable “that the verdict of guilt in this case may not be the result of honest fact-finding,” but rather, the result of the combination of errors by the trial court (People v Badine, 301 AD2d 178, 183 [2002]; see People v Montoya, 63 AD3d at 965; People v Dean, 50 AB3d 1052, 1056 [2008] [“the conduct of the trial, when viewed as a whole, evinces such undue prejudice to the defendant that she was deprived of her constitutional entitlement to a fair trial”]). Accordingly, the judgment of conviction must be reversed, and a new trial ordered (see CPL 470.20).
In light of the foregoing, we need not reach the defendant’s remaining contentions. Skelos, J.P, Austin, Roman, JJ., concur.
Eng, J., dissents, and votes to affirm the judgment appealed from, with the following memorandum:
On February 27, 2005, at sometime after 1:00 p.m., officers of the Suffolk County Police Department were summoned to a home on McArthur Boulevard in Hauppauge, the residence of Scott and Laura Nager, to investigate a report of a break-in and possible homicide. Upon entering the Nager residence, the police discovered the body of the victim, 51-year-old Scott Nager, slumped on a living room sofa. It was later determined that the victim had been killed by a blow to the neck inflicted with an *590 antique Japanese samurai sword, which had nearly decapitated him. Hours after the discovery of the body, the victim’s 18-year-old stepson, the defendant, Zachary R. Gibian, fully confessed to the crime, giving the police extensive written and videotaped statements. However, at trial more than one year later, the defendant repudiated his confession, and claimed that his 48-year-old mother, Laura Nager, physically debilitated by multiple sclerosis, was the true killer. Although the defendant was permitted to testify, without any limiting instructions to the jury whatsoever, that his mother killed his stepfather, the majority nevertheless concludes that the defendant was deprived of a fair trial largely because he was not allowed to recount, in step-by-step detail, precisely what his mother supposedly told him about how she had committed the crime. I believe that the trial court properly excluded the defendant’s proposed testimony because it did not genuinely fall within the scope of the state of mind exception to the hearsay rule, and was offered, in reality, as proof of his claim that his mother was the killer. Accordingly, I respectfully dissent, and vote to affirm the judgment of conviction.
The defendant’s trial commenced on October 23, 2006, and continued for more than three weeks. During the course of trial, 19 witnesses testified for the prosecution, and the defendant took the stand to testify in his own behalf. In addition to the defendant’s confession, the prosecution relied upon the testimony of several of the defendant’s friends, police officers involved in the investigation, and experts who examined the crime scene and conducted DNA testing.
The defendant’s friends T.J. Harrelson and Joseph Rappa both testified that they were aware that the defendant had a troubled relationship with his stepfather, and that the defendant had made statements about killing him prior to the murder. Rappa testified that on the night before the murder, the defendant told him that he was thinking of killing his stepfather. Although Rappa did not take the defendant seriously, he attempted to discourage him by telling him that he did not think it was a good idea. Harrelson similarly stated that the defendant had told him in the past that he wanted to kill his stepfather, but that he, too, had not taken the defendant seriously.
Harrelson further testified that the defendant slept over at his house the night before the murder, and that he dropped the defendant at home at about 11:00 a.m. the following day, which was Sunday, February 27, 2005. Harrelson was on his way to meet his girlfriend and her parents for a 12:30 p.m. brunch when he received a phone call from the defendant asking that he be a *591 good friend and come pick him up. When Harrelson arrived at the Nager residence a few minutes later, the defendant ran out, wearing clothing different from what he had had on that morning, and carrying a black garbage bag. The defendant, who appeared distraught and was breathing hard, told Harrelson that he had killed his stepfather, and asked if he had any blood on him. Although the defendant did not have any blood on him, Harrelson noticed a cut on the back of his hand. The defendant also told his friend that the garbage bag he was carrying contained clothes and a knife, and that he had to get rid of it. Harrelson drove the defendant to the Vet’s Mall, where the defendant disposed of the garbage bag in a dumpster behind the building. Harrelson then dropped the defendant off at the home of a mutual friend. Before the defendant left Harrelson’s car, the defendant handed Harrelson some containers of Oxycontin pills, and asked him to hide them. Later in the day, when detectives arrived at his home, Harrelson told them what had happened, and showed them where he had hidden the pills. Harrelson also brought the detectives outside to see his car, which was parked in the driveway. While showing the detectives his car, Harrelson noticed a latex glove on the floor near the front passenger seat, where the defendant had been sitting.
The police arrived at the Nager residence at about 1:11 p.m. on the afternoon of the murder. According to the testimony of two responding officers, the defendant’s mother opened the door of the residence and led them inside, where they saw the victim’s body slumped down on a sofa, partially covered by a white sheet. The mother had a small amount of blood on her hands, and indicated that she had been administering CPR. One of the responding officers also observed that the mother appeared weak, and walked very slowly with the assistance of a cane. A detective who arrived at the scene about an hour later concluded, based upon his investigation, that the blood on the mother’s hands was consistent with that of a person rendering first aid.
The defendant returned home at about 4:30 p.m., and initially told a homicide squad detective that both his mother and stepfather were asleep when he left the house at 11:30 that morning. Shortly before 6:00 p.m., the defendant voluntarily agreed to accompany Detectives Giordano and Ciccotto to police headquarters. After the defendant was advised of his constitutional rights and agreed to speak to the detectives, they began questioning him about what he had done that weekend. The defendant explained that he had spent Saturday night at the Harrelson residence, and claimed that he had returned home for *592 only a few minutes on Sunday morning to change clothes. The defendant maintained that both his mother and stepfather were asleep on separate couches in the living room when he arrived home, and that they were still asleep 10 to 20 minutes later, when Harrelson picked him up. When the defendant completed his account of his weekend, Detective Ciccotto asked him directly whether he had killed his stepfather, and the defendant replied that he had not. Detective Ciccotto then asked the defendant whether he thought his mother was physically capable of killing his stepfather, to which the defendant answered “no.” Detective Ciccotto pressed the defendant to explain who else could have killed his stepfather since he and his mother were the only two people in the house, and told him that the police were in the process of gathering evidence which would tell them who the killer was. After voicing his belief that the defendant was the killer, Detective Ciccotto once again asked him whether he had killed his stepfather. At this point, the defendant put his head down, sobbed a little bit, and admitted his guilt. The defendant stated that he had killed his stepfather with a sword, and explained that he had done so because his stepfather was abusive and treated him and his mother badly.
In a six-page written statement, the defendant described his stepfather as verbally abusive, and provided a narrative of how the murder had occurred. According to his written confession, when the defendant arrived home Sunday morning, his mother woke up, started crying, and revealed that she had been fighting with his stepfather all night. The defendant felt “really bad” for his mother, and knew he had to do something. The defendant told his mother to go upstairs, and then proceeded to the garage, where he retrieved a Japanese sword. Returning to the living room, the defendant stood behind the couch where his stepfather was sleeping, and hit him on the left side of the neck. However, the defendant did not swing hard enough, and his stepfather sat up, holding his neck and demanding to know who had hit him. The defendant, who was hiding behind a small wall in back of the couch, moved out from behind the wall. When the defendant’s stepfather saw him, he cursed at him and said that he “should have killed” the defendant. The defendant then hit his stepfather with the sword in the back of the neck, killing him. The defendant placed the sword, along with the clothes and latex gloves he had been wearing, in a black plastic bag, which he later disposed of in a dumpster behind Vet’s Mall. The defendant also placed other items, including a silver revolver and some pills, in the plastic bag, in the hope that if it were to be discovered, the police would think that somebody had broken into the house to steal these things. After signing *593 his written confession, the defendant drew three sketches illustrating the position of the furniture in his family’s living room, and indicating where he was standing when he struck the first and second blows. The defendant later repeated his confession on videotape.
At about 9:00 p.m. that evening, the police recovered the black plastic bag, which contained, among other things, the defendant’s jeans and sweatshirt, and a razor sharp 23-inch Samurai sword, which weighed approximately IV2 pounds. Only the first 9V2 inches of the sword, from the tip down, were stained with blood, and there were no bloodstains on the clothing recovered from the bag. However, a serologist employed by the Suffolk County Crime Lab testified that two different bloodstains on a T-shirt found in the defendant’s room matched the victim’s DNA profile. A forensic scientist thereafter explained that the blood stains on the T-shirt were contact stains, of the type which would be caused if a bloody object had been placed on top of the garment. The forensic scientist further testified that the description of the murder set forth in the defendant’s confession was consistent with the blood splatter patterns found at the crime scene, and that given the position where the perpetrator was standing when the blows were inflicted, he would not expect to find blood on the handle of the murder weapon, or on the perpetrator.
Additional expert testimony was provided by the Suffolk County Deputy Medical Examiner, who explained that her autopsy revealed that the victim had sustained sharp force injuries to the left side of the face, the back of the neck, and the fingers on the left hand. In her opinion, the most likely scenario was that the killer inflicted two blows with a sharp cutting instrument. The first injury was consistent with the victim lying down on the couch and being struck by an assailant positioned behind the couch. The injuries to the victim’s fingers were consistent with the infliction of the second blow while the victim was in a seated position, with his hand to the side of his neck. The Medical Examiner further testified that in view of the assailant’s position behind the couch, it was not surprising that the killer would have no blood on any part of his body.
Although the defendant’s confession indicated that his stepfather was verbally abusive, at trial he portrayed himself as the victim of sexual abuse, which allegedly began when he was 15 years old. The first incident occurred when his stepfather, who was drunk, pointed a 9 millimeter gun at the defendant, and told him that he had to give him oral sex or he would kill the defendant and the defendant’s mother. On that same occa *594 sion, the defendant’s stepfather also ordered the defendant to take photographs of him with a tommy gun in his mouth. Two photographs of the defendant’s stepfather posing with a gun in his mouth were published to the jury. The defendant further maintained that the sexual abuse continued up until the night before the murder. According to the defendant, his mother walked into the room while this final act of sexual abuse was occurring, and began yelling at his stepfather. The defendant then ran out of the room, and called his friend Harrelson, who picked him up.
The defendant further testified that he slept over at the Harrelson residence, and returned home at about 11:00 a.m. on Sunday morning. When the defendant entered the house, he saw his stepfather sitting up on one couch with a big cut to the back of his neck and the side of his face. The defendant’s mother was seated on another couch, crying and holding a bloody towel. There was also blood on the mother’s face and on her pajamas. The defendant stated that he asked his mother what had happened, but before he could reveal her reply, the prosecutor raised a hearsay objection. During a discussion outside the presence of the jury, defense counsel claimed that he wished to elicit testimony about the mother’s statements to the defendant, not for the truth of the matter asserted in those statements, but as evidence of the defendant’s state of mind and to demonstrate why he confessed. Defense counsel further advised the trial court that if the defendant was permitted to testify about what his mother told him, he would state that she had been “very specific,” and had told him “she went to the garage, got the sword, came back. He was asleep, he was laying down on the couch. She hit him on the left side. He sat up. He grabbed his ear. He started yelling things. She hit him again behind the back of the neck and he was dead.” Defense counsel further claimed that “[t]he only way I can explain to the jury why, what he said in his written . . . [confession], is to have him say the words she said to him, which then created his state of mind and his motivation to do what he did.” The court sustained the prosecutor’s objection.
Although the defendant was not permitted to specifically recount what his mother allegedly told him about the murder, he was able to testify that he sat down with her for several minutes, and that after she gave him “an explanation” about what had occurred, he told her to go upstairs and clean up. The defendant then took the sword, which was leaning against the couch, and placed it in a black plastic bag, along with the clothes he had been wearing, and other items including Oxycontin pills, *595 a revolver, and two knives. The defendant stated that he noticed the sword because his mother had pointed it out to him. The defendant further testified that his statements to the police about killing his stepfather were untrue, and repeatedly maintained that he had confessed to protect his mother. He similarly claimed that protecting his mother was his motivation for attempting to make it appear as if the Nager residence had been burglarized. The defendant also explained that he was able to draw sketches depicting where he was standing when he struck his stepfather, and provide a confession that coincided with the forensic scientist’s scenario of how the murder had occurred, because his mother had told him “exactly what happened.” The defendant added that he merely told the police “what I was told. I showed them what happened that my mother told me.” When specifically asked on cross-examination who had killed his stepfather, the defendant answered, “my mother.” The defendant also asserted that his mother had promised to come forward and admit that she was the killer, but had not done so.
On summation, defense counsel explicitly argued that the defendant’s mother was the real killer, and suggested that the police had rushed to judgment by failing to consider her as a possible suspect. Defense counsel submitted to the jury that there had been no proof that the mother was indeed physically incapable of using the razor sharp Samurai sword to inflict the cutting wounds which the victim sustained. He also pointed out that the police had failed to examine the bathroom where the mother cleaned up after the killing because the defendant had already confessed. Defense counsel further suggested to the jury that what the mother in fact told the defendant when he arrived home on the morning of the murder was that “she retrieves the sword, she goes behind the couch, she hits him. He sits up, he holds his face, she hits him again, he’s dead. At that point, [the defendant] makes a decision, I’m going to cover-up for my mom.” He concluded by urging the jury to remember that the mother had continually promised the defendant that she was going to do the right thing and come forward.
After extensive deliberations which included numerous readbacks of testimony, the jury ultimately reached a verdict, convicting the defendant of murder in the second degree.
On appeal, the defendant raises several issues, including a claim that the trial court committed reversible error by precluding him from testifying, pursuant to the state of mind exception to the hearsay rule, as to exactly what his mother allegedly told him about how she had killed his stepfather. The defendant contends that this evidence was critical because “[t]he only way *596 the jury would understand why he [took the blame in his confession] and how he was accurate, was to tell them the exact words that she used in detailing the crime . . . The evidence would have explained how his state of mind was created, how he could accurately describe the crime and his motivation to protect his mother.” The People respond that despite defense counsel’s claim that the proposed testimony was being offered as circumstantial proof of the defendant’s state of mind, in reality, “counsel was attempting to present the jury with hearsay evidence offered for the truth of its assertion—that [the defendant’s] mother committed the murder.” I agree that the defendant was attempting to use his proposed testimony as direct evidence that his mother had killed his stepfather, and that the exclusion of this testimony was not error.
An out-of-court statement which is offered to prove the truth of its content is hearsay (see Prince, Richardson on Evidence § 8-101 [Farrell 11th ed]; People v Huertas, 75 NY2d 487, 491-492 [1990]; People v Kass, 59 AD3d 77, 86-87 [2008]). Such out-of-court statements have traditionally been excluded “because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his [or her] statements; the declarant’s word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury” (Chambers v Mississippi, 410 US 284, 298 [1973]).
However, it has long been recognized that in some instances, “[t]he mere utterance of a statement, without regard to its truth, may indicate circumstantially the state of mind of the hearer or of the declarant” (Prince, Richardson on Evidence § 8-106, at 502 [Farrell 11th ed]; see People v Reynoso, 73 NY2d 816, 819 [1998]). Thus, under what has been termed an “apparent exception” to the hearsay rule, an out-of-court statement which is offered not for the truth of its content, but solely for the effect of its utterance, is admissible evidence (see People v Ricco, 56 NY2d 320, 328 [1982]; People v Minor, 69 NY2d 779, 780 [1987]; People v Kass, 59 AD3d at 87; People v Stevens, 174 AD2d 640, 641 [1991]). For example, in Minor, the defendant was charged with criminal sale of a controlled substance in the third degree, arising from the sale of drugs to an undercover officer. At trial, he raised an entrapment defense, which he sought to prove by testifying about statements allegedly made by the police informant who had introduced him to the undercover officer. The trial court sustained the prosecutor’s objections to these statements upon the ground that they were hearsay, and *597 instructed the jury to disregard any testimony regarding the informant’s statements. In reversing, the Court of Appeals briefly noted that the informant’s statements were admissible to show inducement and the defendant’s state of mind, which was relevant to his entrapment defense.
Another illustration of a situation in which an out-of-court statement was found to be admissible as state of mind evidence is provided by this Court’s recent decision in People v Kass (59 AD3d 77 [2008]). In that case, the defendant allegedly asked a fellow inmate to help him hire hit men to kill two witnesses who were expected to testify against him. The inmate, a registered jailhouse informant, reported the defendant’s request to the police, and an investigation was begun involving undercover officers posing as contract killers. At trial, the defendant claimed that it was the informant who had first suggested, and then insisted, that the defendant speak with the supposed hit men, and that he did so only because he was afraid of the informant. In the course of his testimony, the defendant recounted a conversation during which the informant described himself as “ ‘a very big drug dealer in Washington Heights’ ” (id. at 86). The prosecutor objected to this statement as hearsay, and the trial court sustained the objection. In concluding that it was error to preclude the subject testimony, this Court stated that, “[wjhether the informant was, in fact, ‘a very big drug dealer in Washington Heights’ was, of course, entirely irrelevant to the issues at the defendant’s trial. But, given the defendant’s testimony that he had met and spoken with the ‘hit men’ only out of fear of the informant, what the defendant thought about the informant was an essential part of the defense. Thus, the informant’s boast about being ‘a very big drug dealer in Washington Heights,’ although not relevant for its truth, was very relevant for the effect its utterance may have had in contributing to the defendant’s fear of the informant” (id. at 86-87).
In contrast, here, the out-of-court statements the defendant sought to introduce were not necessary to elucidate his state of mind and explain why he confessed. This is not a situation in which the defendant sought to testify that his mother implored him to take the blame for the murder, perhaps because of her fear of imprisonment or poor health. Rather, defense counsel advised the court that the defendant intended to testify that his mother told him, in step-by-step detail, exactly how she had committed the crime. Although this testimony was ostensibly offered as state of mind evidence, its purpose was not to show what motivated the defendant to confess. Rather, it was to *598 explain how the defendant was able to provide the police with a description of the murder which was fully consistent with the forensic evidence presented at trial. The only import to be drawn from such testimony was that the defendant’s mother was able to provide him with the details of the crime because she was the killer. Thus, the proposed testimony was not within the bounds of the state of mind exception.
Analogously, in People v Reynoso (73 NY2d 816 [1988]), the defendant claimed that the trial court had erred in excluding a statement he had made to his sister, within two hours after the shooting, that he believed the victim had been armed. In rejecting the defendant’s argument, the Court of Appeals concluded that “[a]lthough defendant argued that this evidence was offered solely to establish his state of mind, and thus was not hearsay . . . the statement was irrelevant unless offered to prove the truth of the matter asserted—that defendant believed the victim was armed—and for that purpose it was inadmissible hearsay” (id. at 819). Here too, while the defendant’s proposed testimony was offered under the guise of providing insight into his state of mind, its true purpose was to provide evidence that the defendant’s mother was, in fact, the killer.
It is also important to note that the defendant failed to establish the necessary foundation for the admission of his mother’s statements into evidence as declarations against penal interest. Declarations against penal interest are regarded as more reliable than other forms of hearsay based on the assumption that people normally do not make statements damaging to themselves unless they are true (see People v Brensic, 70 NY2d 9, 14 [1987]; People v Settles, 46 NY2d 154, 167 [1978]). “The exception has been recognized out of necessity and in the belief that the self-inculpating nature of the declaration serves as an adequate substitute for the assurance of reliability usually derived from the administration of an oath and the testing of the statements by cross-examination” (People v Brensic, 70 NY2d at 14). However, since “these traditional guarantees are absent when out-of-court declarations against penal interest are offered, such evidence is admitted cautiously and only after reliability is firmly established” {id.). Before a declaration against penal interest may be admitted for its truth, the proponent must establish that: (1) the declarant is unavailable to testify, whether by reason of death, absence from the jurisdiction, or refusal to testify on constitutional grounds; (2) the declarant was aware at the time of the statement was made that it was contrary to his or her penal interest; (3) the declarant had competent knowledge of the underlying facts; and (4) there is sufficient *599 competent evidence independent of the declaration to assure its trustworthiness and reliability (id. at 15; see People v Thomas, 68 NY2d 194, 197 [1986], cert denied 480 US 948 [1987]; People v Settles, 46 NY2d at 167).
Discussing the importance of the requirement that there be independent proof of reliability in Settles, the Court of Appeals observed that while the rationale for allowing declarations against penal interest into evidence stems from the belief that a person would not ordinarily make a statement which would subject himself or herself to criminal prosecution, “[a]s with all generalizations . . . human motivation and personality renders the stated reason for permitting these declarations immediately suspect. Simply stated, people may prevaricate, despite the consequences to themselves, to exculpate those they love or fear, to inculpate those they hate or because they are inveterate or pathological liars” (People v Settles, 46 NY2d at 168). Thus, to circumvent fabrication and ensure the reliability of these statements, “there must be some evidence, independent of the declaration itself, which fairly tends to support the facts asserted therein ... By imposing such a requirement a balance is struck between the interest of defendant to introduce evidence on his own behalf and the compelling interest of the State to preserve the integrity of the fact-finding process” (id. at 168-169).
Here, the first prong of the test for admissibility, that the declarant be unavailable, was at least arguably satisfied by defense counsel’s representation that the mother’s attorney had advised him that she would invoke her Fifth Amendment right against self incrimination if called to testify. Further, given the circumstances under which the mother’s statements against penal interest were made, and the nature of those statements, the second and third prongs of the test may be deemed satisfied. However, the fourth prong of the test—that there be sufficient competent evidence independent of the declaration to assure its trustworthiness and reliability, was far from satisfied here. As discussed, the rationale for admitting statements against penal interest into evidence is that they are more trustworthy than other forms of hearsay because human experience teaches that people do not ordinarily make statements which will subject them to criminal prosecution unless those statements are true. However, this rationale loses its force where, as here, the declaration against penal interest has supposedly been made to the defendant charged with committing the very crime which is the subject of the declaration. Reliability cannot be presumed where the person with the greatest incentive to prevaricate seeks to assert that someone else admitted the commission of the crime.
*600 Furthermore, there is little, if any, independent evidence to corroborate the truthfulness of the mother’s purported admission. While the first police officers who responded to the scene observed a small amount of blood on the mother’s hands, there was testimony that the blood on her hands was consistent with an effort to perform first aid. Moreover, the presence of the blood on the mother’s hands was inconsistent with the forensic evidence, which supported the conclusion that the killer struck both blows while standing behind the sofa. No other independent evidence even remotely links the mother to the homicide, establishing a reasonable possibility that the statements the defendant attributes to her were true. Accordingly, the defendant’s proposed testimony could not properly be admitted into evidence as direct evidence of his mother’s guilt on the theory that her statements were declarations against penal interest (see People v Ennis, 11 NY3d 403, 413 [2008], cert denied 556 US —, 129 S Ct 2383 [2009]; People v Coleman, 69 AD3d 430, 431-432 [2010]; People v Manor, 38 AD3d 1257, 1258 [2007]; People v Washington, 31 AD3d 795, 796 [2006]; People v Roberts, 288 AD2d 403, 404 [2001]; People v Otero, 288 AD2d 67 [2001]).
In contrast to Chambers v Mississippi (410 US 284 [1973]), upon which the majority relies, this is not a case in which the trial court mechanistically applied the hearsay rule in a manner which denied the defendant his right to present a defense. Although the right to present a defense is fundamental, “[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence” (id. at 302). In Chambers, the trial court, in accordance with Mississippi law which did not at that time recognize declarations against penal interest as an exception to the hearsay rule, refused to allow three witnesses to testify to statements in which a third party admitted that he had committed the murder with which the defendant was charged. In finding that the exclusion of this testimony deprived the defendant of a fair trial, the United States Supreme Court noted that the testimony rejected by the trial court both “bore persuasive assurances of trustworthiness,” and was critical to the defense (id.). While the testimony excluded here can be viewed as critical to the defense, unlike the testimony excluded in Chambers, it bore no assurance of trustworthiness. Thus, the exclusion of this testimony did not violate a fundamental constitutional right (see People v Coleman, 69 AD3d 430 [2010]; People v Williams, 291 AD2d 897 [2002]; People v Esteves, 152 AD2d 406 [1989]).
While I believe that the exclusion of the defendant’s proposed *601 hearsay testimony was entirely proper, even assuming that it was not, the defendant’s right to present a defense was not curtailed in any meaningful way, because the substance of his proposed testimony was clearly conveyed to the jury. After describing his own observations when he arrived home on the morning of February 27, 2005, which circumstantially suggested that his mother was the killer, the defendant was permitted to testify that after speaking to his mother, he directed her to go upstairs and clean herself up, and then placed the murder weapon—which she had pointed out to him—in a plastic garbage bag. In addition, the defendant explicitly testified that he was able to provide the police with an account of the crime, and sketches of the crime scene, which coincided with the forensic evidence because his mother had told him exactly what happened. Lest the import of this testimony escape the jury, defense counsel asserted during his closing argument that what the mother actually told the defendant when he arrived home was that she had retrieved the sword, gone behind the couch, hit the victim once while he was lying down, and hit him again after he sat up. Far from being prejudiced, the defendant actually benefitted from the indirect manner in which the substance of his excluded testimony came before the jury. Had the defendant’s hearsay testimony regarding his mother’s statements been admitted as state of mind evidence, as the defendant requested, it would have been incumbent upon the trial court to issue a limiting instruction explaining that these statements could not be considered for their truth. However, since the mother’s alleged statements to the defendant were not. admitted as state of mind evidence, no such limiting instruction was given here. The jury was, thus, allowed to freely consider the readily inferable substance of the mother’s statements to the defendant as direct evidence that she was the killer, which placed the prosecution in the position of having to disprove her guilt. Moreover, despite the trial court’s exclusion of the mother’s statements, the defendant was permitted to repeatedly testify that he confessed to protect her and, thus, was afforded ample opportunity to convey his mental state to the jury (see People v Umonzor, 210 AD2d 516 [1994]). In addition, the evidence of the defendant’s guilt, which included the admission he made to his best friend as well as the detailed statements he gave to the police, was overwhelming. Under these circumstances, any error in precluding the proposed testimony was harmless (see People v Crimmins, 36 NY2d 230, 237 [1975]; People v Barr, 60 AD3d 864 [2009]; People v Black, 180 AD2d 806, 807 [1992]; People v Martinez, 154 AD2d 401, 402 [1989]).
Nor do I agree that the imposition of a reasonable limit on *602 the length of defense counsel’s summation was an improvident exercise of discretion. The record reveals that before closing arguments began, the trial court asked both defense counsel and the prosecutor, for scheduling purposes, to estimate how much time they would need. According to the trial court, both defense counsel and the prosecutor replied that they would need an hour , to an hour and a half. After defense counsel had been speaking for approximately one hour, he requested a brief recess. During the recess, defense counsel advised the trial court that he would need an additional 45 minutes to one hour to complete his summation. The trial court noted that defense counsel had estimated that he would need an hour to an hour and a half for summation, not two hours, and agreed to give defense counsel an additional 45 minutes. When defense counsel resumed his summation, he told the jury “[fjolks, I’m going to have to move a lot quicker, so please stay with me.” Nevertheless, defense counsel completed his summation, which spans over 80 pages of the trial transcript, without being cut off by the trial court. At the conclusion of the prosecutor’s considerably shorter summation, which spans close to 60 pages of the trial transcript, defense counsel moved for a mistrial, claiming, inter alia, that he had not had sufficient time to complete his summation “in a proper fashion.” The trial court denied the motion, stating that defense counsel had “more than ample time to sum up on this case.”
It is beyond cavil that “closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial” (Herring v New York, 422 US 853, 858 [1975]; see People v Love, 244 AD2d 431 [1997]; People v Brown, 136 AD2d 1, 16 [1988], cert denied 488 US 897 [1988]). However, as the United States Supreme Court explained in Herring, “[t]his is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He [or she] may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He [or she] may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects, he [or she] must have broad discretion” (Herring v New York, 422 US at 862). Here, both the prosecutor and defense counsel originally estimated that they would need an hour to an hour and a half for closing arguments. When defense counsel indicated, approximately one hour into his summation, that he would need 45 minutes to one hour more, the court stated that he could have an additional 45 minutes. Defense *603 counsel later asserted that he was not afforded sufficient time to complete his summation in a proper manner, but nothing in the record indicates that he was cut off, and his summation was considerably longer than the prosecutor’s summation. Under these circumstances, the trial court did not improperly exercise the broad discretion with which it is vested by limiting the duration of closing arguments, and the defendant’s right to present a closing argument was not impaired (see People v Love, 244 AD2d 431 [1997]; People v Troy, 209 AD2d 943, 944 [1994]; People v Brown, 136 AD2d at 16).
Finally, I believe that the record demonstrates that there was no juror misconduct in this case which would rise to the level of warranting a reversal. As deliberations neared their conclusion, the trial court received a note from juror number 7, stating that he had made some notes at home after the first day of deliberations, and read them to the panel the next day. When the trial court announced its intention to conduct an inquiry, defense counsel objected, expressing his belief that juror number 7 was in the minority favoring acquittal, and that calling the juror in for questioning would be “coercing him, as well as the rest of the jury panel.” Over objection, the trial court asked that juror number 7 be brought in. Juror number 7 confirmed, as indicated in his note, that when he went home after the first day of deliberations, he made some notes which he then read to his fellow jurors the next morning. He also made notes during the second day of deliberations, and brought them home. Juror number 7 stated that the purpose of the notes was essentially to remind himself of points he wished to bring up during deliberations, and questions he wanted to ask the other members of the panel, and assured the trial court that he had not shown these notes to his family. Juror number 7 further revealed that when juror number 11, who was employed as a court officer in New York City, learned that he had taken notes, she accused him of “trying to get a mistrial,” and told the panel that there would be a mistrial if the note-taking came to the trial court’s attention. Juror number 7 tore his notes from his notepad and gave them to the jury foreperson, who placed the notes in an envelope. Juror number 7 also indicated that he continued to write notes during deliberations, which the foreperson would take at the end of the day, and return the next morning.
After the inquiry of juror number 7 was completed, defense counsel moved for a mistrial, arguing that the conduct of juror number 11 in accusing juror number 7 of attempting to cause a mistrial, and hiding the note-taking from the trial court, was putting pressure on juror number 7 “to back off his position in *604 favor of my client.” Defense counsel also contended that juror number 11 was “giving advice on the law as to what would happen if the court found out about him reading the notes to them.” The prosecutor responded that he did not believe that it was improper for jurors to take notes during deliberations to augment their discussions, and that it was not improper for the foreperson to take possession of these notes as the leader of the jury. The trial court expressed concern that juror number 11 had taken “it upon herself to provide her insights as to what jurors can and cannot do during deliberations.” The trial court also noted that at an earlier point in deliberations when the jurors were given a supplemental charge after indicating they were deadlocked, they thereafter requested a read back of the “Allen charge” (see Allen v United States, 164 US 492 [1896]), despite the fact that the term “Allen charge” had not been used. As the trial court and the attorneys were in the midst of discussing this issue, the trial court received another note from the jury stating that it was “still deadlocked.” The trial court then advised the attorneys that it would ascertain from the jurors whether further deliberations would resolve their differences before determining how to proceed with respect to juror number 7’s note. After the jurors indicated that they wished to continue deliberating, the prosecutor suggested that before deliberations resume, juror number 7 be advised that he had done nothing wrong by taking notes, and that he should disregard the opinion other jurors had regarding his note-taking. However, defense counsel objected, asserting that any conversation with juror number 7 would be inappropriate. Following the resumption of deliberations, defense counsel renewed his motion for a mistrial based upon the alleged misconduct of juror number 11. The trial court denied the motion, stating that after further consideration, it had concluded that “it is clear that nothing improper occurred by this juror, or any other juror on this jury.”
To the extent that the defendant now contends that the trial court failed to conduct an adequate inquiry into the issue of misconduct by juror number 11, his contention is unpreserved for appellate review. Defense counsel protested the trial court’s decision to conduct an inquiry of juror number 7 in the first instance, and after the questioning of juror number 7 was completed, counsel never requested that an inquiry be made of juror number 11, or any of the other jurors (see People v Hicks, 6 NY3d 737, 739 [2005]; People v Albert, 85 NY2d 851, 852 [1995]; People v Gonzalez, 232 AD2d 204, 205 [1996]).
In any event, reversal is not required because this is not a sit- *605 nation in which a juror interjected his or her professional experience into deliberations in a manner which prejudiced the defendant by creating the possibility that the verdict might not be based-solely on evidence received in open court (see Sheppard v Maxwell, 384 US 333, 351 [1966]; People v Arnold, 96 NY2d 358, 364 [2001]). Generally, juror misconduct constitutes reversible error where “(1) jurors conduct[ ] personal specialized assessments not within the common ken of juror experience and knowledge (2) concerning a material issue in the case, and (3) communicat[e] that expert opinion to the rest of the jury panel with the force of private, untested truth as though it were evidence” (People v Maragh, 94 NY2d 569, 574 [2000]; see People v Santi, 3 NY3d 234, 249 [2004]). “Jurors are not, however, required to ‘check their life experiences at the courtroom door’ ” (People v Santi, 3 NY3d at 249, quoting People v Arnold, 96 NY2d at 366). Here juror number ll’s professional experience as a court officer had no bearing on any of the material issues in the case, and her alleged misconduct essentially consists of having identified the instruction the jury was given when deadlocked as an “Allen charge,” and having expressed her opinion that bringing juror number 7’s note-taking to the trial court’s attention would result in a mistrial. While the better course would have been for either juror number 11 or the jury foreperson to have brought the issue of juror number 7’s note taking to the trial court immediately to clarify whether this conduct was prohibited, “not every misstep by a juror rises to the inherently prejudicial level at which reversal is required automatically” (People v Brown, 48 NY2d 388, 394 [1979]; see People v Clark, 81 NY2d 913, 914 [1993]; People v Lemay, 69 AD3d 757 [2010]). Considering the nature of the alleged misconduct, which was wholly unrelated to the jury’s core fact-finding function of determining the defendant’s guilt or innocence, there was no significant risk of prejudice to a substantial right. In the absence of a such a showing of prejudice, the defendant is not entitled to a new trial on the ground of juror misconduct (see People v Rodriguez, 100 NY2d 30, 35 [2003]; People v Lemay, 69 AD3d 757 [2010]).