People v Pascuzzi (2019 NY Slip Op 04790)





People v Pascuzzi


2019 NY Slip Op 04790


Decided on June 13, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: June 13, 2019

110585

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
TYLER S. PASCUZZI, Appellant.

Calendar Date: April 23, 2019

Before: Garry, P.J., Egan Jr., Clark, Mulvey and Pritzker, JJ.


Hug Law, PLLC, Albany (Matthew C. Hug of counsel), for appellant.
P. David Soares, District Attorney, Albany (Vincent Stark of counsel), for respondent.



MEMORANDUM AND ORDER
Garry, P.J.
Appeal from a judgment of the Supreme Court (Breslin, J.), rendered April 5, 2017 in Albany County, upon a verdict convicting defendant of the crimes of manslaughter in the second degree (two counts) and aggravated vehicular homicide.
Shortly before midnight on July 4, 2015, defendant drove while intoxicated at an extremely high speed on Interstate 90 (hereinafter I-90) in the Town of Guilderland, Albany County and caused a collision that resulted in the deaths of his two passengers, Cody Veverka and Alicia Tamboia (hereinafter collectively referred to as the victims). Defendant was charged with multiple felonies and, after a jury trial, was convicted of manslaughter in the second degree (two counts) and aggravated vehicular homicide. Supreme Court sentenced defendant to a prison term of 8&frac13; to 25 years on the conviction for aggravated vehicular homicide and lesser concurrent terms on the manslaughter convictions. Defendant appeals.
Initially, defendant contends that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence in that the People failed to prove that he, rather than Veverka, was driving at the time of the collision. Defendant's legal sufficiency challenge is unpreserved for appellate review, as his motion for a trial order of dismissal was not specifically directed at this alleged error (see People v Novak, 148 AD3d 1352, 1353 [2017], lv denied 29 NY3d 1084 [2017]). Nevertheless, as an essential part of our weight of the evidence review, we must determine whether each element of the crimes for which defendant was convicted was proven beyond a reasonable doubt (see People v Danielson, 9 NY3d 342, 348-349 [2007]; People v Gill, 168 AD3d 1140, 1140 [2019]).
The testimony of the People's witnesses established that on the day of the accident, defendant thoroughly cleaned the interior and exterior of his vehicle, a blue high-performance Volkswagen Golf R32, because he intended to sell it the next day. That evening, defendant and his roommates held a party at their apartment in Schenectady County. The victims were among the guests, and most of the attendees, including defendant, were drinking. The group went to a [*2]fireworks display at about 9:00 p.m. and then returned to continue the party. Later, defendant and the victims left in defendant's vehicle; no witness noticed who was driving. One of defendant's roommates called defendant and learned that he and the victims were at a bar in the Town of Colonie, Albany County. The roommate testified that he asked defendant whether he was driving and defendant said that he was not.
The bartender who was on duty that evening, a friend of defendant, testified that he had invited defendant to the bar and that defendant and the victims arrived at about 10:30 p.m. and stayed for about an hour. The bartender testified that defendant and the victims each drank one beer. Defendant paid for the drinks by credit card, signing the receipt at 11:28 p.m. The bartender did not see who was driving when the group left.
A witness who had left work in Albany at 11:15 p.m. or 11:20 p.m. testified that he was driving westbound on I-90 at about 70 miles per hour when a blue Volkswagen passed him on the right. The Volkswagen was moving "so fast it was like [the witness] was sitting still," and his car shook as it passed. A short distance ahead, another driver was traveling at about 65 miles per hour when a blue car sped past. This witness smelled burning rubber and estimated that the blue car's speed was at least 120 miles per hour. After it passed, the witness saw "a huge burst of just dust . . . and then a bunch of glass [and debris] came flying at our window." At about the same time, another driver, who was traveling at about 70 miles per hour, saw a car "flying by [her]" so fast that "it felt like [she] was standing still." This witness estimated the car's speed at over 100 miles per hour. As she watched, the car struck a green car in the center lane, causing that vehicle to spin off the road into the center median. The speeding vehicle then "clipped" the back of a tractor trailer and "spun out," with the sound of crashing metal and "sparks everywhere."
The trial evidence revealed that at approximately 11:42 p.m., the Volkswagen first struck a green Honda in the rear, sending it off the road, and then struck the rear of a tractor trailer with such force that the Volkswagen was severed into two halves between the front and back seats. The Volkswagen's rear half crossed the median and the center guide rail and came to rest on the eastbound side of the highway, while the front half continued to travel westward until it entered the median and struck the westbound side of the center guide rail.
Defendant and Veverka were found near the front half of the Volkswagen on the western side of the car. Veverka, whose right arm had been amputated, was lying farther to the west than defendant. Rescuscitation was attempted, but he died at the scene. Tamboia was found on the eastbound side of the center guide rail, where the rear half of the Volkswagen had traveled. Her injuries were so severe that rescue personnel determined that resuscitation efforts would be futile. Bystanders who assisted defendant before first responders arrived testified that he was initially unconscious, but that he became more responsive and was mumbling incoherently by the time rescue personnel arrived. A paramedic who performed an initial assessment testified that defendant stated his name and responded to some questions with the word "no."
State Trooper Heath McCrindle testified that he first assisted with resuscitation efforts for Veverka and then spoke with defendant, who had been placed on a backboard but had not yet been transferred into an ambulance. McCrindle asked defendant whether anyone else had been in the vehicle, and defendant said no. McCrindle then asked whether defendant had been driving, and defendant said yes. McCrindle said that defendant appeared to be alert and conscious, and looked at McCrindle as he spoke. Two paramedics who attended defendant in the ambulance testified that their examination revealed lacerations on his head, left arm and left shoulder and an abrasion on the right side of his abdomen, but no apparent broken bones or signs of a significant head injury. They testified that defendant was able to follow directions to do such things as opening his eyes and raising his arm. He did not give verbal responses to most of their questions, but did say "no" in response to several questions. When he was asked where he had been that evening, he gave a fragmented response that included the word "fireworks."
At the hospital, State Trooper Jonathan Schroll obtained permission from a nurse to enter defendant's room to ask for his consent to a blood sample. Defendant agreed to allow the test and signed a consent form. Schroll said that defendant appeared to understand the request and had no difficulty holding the pen. The blood sample was obtained at 1:07 a.m., and defendant's blood alcohol content was later determined to be .18%. Schroll left the room and waited nearby with investigator David Burns until about 2:15 a.m., when medical personnel permitted them to speak with defendant again. Burns and Schroll testified that defendant told them that he had been traveling to his apartment before the crash, and gave them that address and his roommates' names. The troopers asked defendant if he had been driving, and defendant said yes. When asked with whom he had been driving, defendant said he was alone. Burns asked defendant whether he had been drinking and partying, and defendant said, "I'm pretty damn sure I was. I'm lying here. Aren't I?" The troopers were then advised that defendant needed further tests and terminated the conversation.
One of Veverka's family members testified that he accessed the photographs in Veverka's phone after it was returned to the family, discovered that the last picture taken showed a car's speedometer, and turned the phone over to police. Data extracted from the phone revealed that this photograph had been taken just before 11:41 p.m. on the night of the crash. The photograph, which was submitted into evidence, depicted a speedometer that matched that of the Volkswagen and displayed a speed of 155 miles per hour.
State Police investigators searched the wreckage of the Volkswagen, took samples for DNA testing and discovered a scrap of red fabric wedged into the front passenger door that corresponded with a tear in Veverka's red underwear. A forensic investigator testified that DNA on the fabric scrap matched that of Veverka. Veverka's DNA was also found on the front passenger seat, the roof over the front passenger seat, the gear shift, the steering wheel, the light switch and in bloodstains on the front passenger airbag and the driver's airbag. The Volkswagen's key had a mix of Veverka's DNA and that of at least one other contributor. The only identifiable DNA from defendant found in the vehicle came from a driver's side panel in the rear of the vehicle. Hairs were collected from the roof behind the driver's seat, but the forensic investigator testified that no hair follicles were included from which DNA could have been obtained, and testing of one sample of the hair itself revealed no DNA. The investigator further testified that DNA was not transferred by every contact, that a person could touch a surface and leave no DNA behind, and that it was not possible to determine when the DNA had been transferred onto the car's surfaces or whether anyone had touched the surfaces after the DNA was transferred.
Michael Sikirica, a physician specializing in forensic pathology and neuropathology, testified that he conducted autopsies of the victims and reviewed photographs of the crash scene, witness statements and other documentation. He described Tamboia's devastating injuries and opined that the cause of her death was multiple severe traumatic blunt force injury. Over a defense objection, he further opined to a reasonable degree of medical certainty that, based upon the nature and location of Tamboia's injuries and the damage to the Volkswagen, she had been in the backseat on the passenger side at the time of the crash.[FN1]
Turning to Veverka's autopsy, Sikirica described injuries primarily on the right side of the body, including abrasions on the right side of Veverka's face that were consistent with dicing marks from fractured glass, the missing right arm, a deep laceration in his right hip in the same location as the previously-noted tear in his underwear and multiple internal injuries, most severe on the right side, including a displacement of the spine to the left caused by force from the right. Sikirica opined that Veverka's right arm was severed as the result of a jagged shearing injury that occurred when the passenger side of the Volkswagen struck the tractor trailer, and that the wound in his right hip was caused when part of the tractor trailer penetrated the car door. Over a defense objection, Sikirica opined to a reasonable degree of medical certainty that Veverka had been [*3]seated in the front passenger seat when the collision with the tractor trailer occurred. Sikirica testified that his opinion was not altered by the discovery of Veverka's DNA in the area of the driver's seat because he did not know when the DNA had been transferred and because the physical evidence "supersede[d]" the DNA evidence and placed Veverka "firmly in the passenger seat."
Bruce McLaughlin, who was a State Police investigator at the time of trial, a member of the collision reconstruction unit and the lead reconstructionist for the accident,[FN2] testified that he and another trooper mapped and photographed the collision site on the night of the accident. McLaughlin then spent about a year investigating and reconstructing the accident based upon such evidence as tracks and scars on the pavement, the locations where the vehicles, occupants and other debris were found, the damage to the vehicles and the occupants' injuries. Using diagrams of the crash site, McLaughlin testified that, in his opinion, the Volkswagen first struck the Honda and then began to rotate counterclockwise as it continued forward until, within less than a second, its passenger side struck the left rear corner of the tractor trailer. McLaughlin opined that the tractor trailer's five-inch-wide underride bar penetrated the front passenger door upon this impact, corresponding with a five-inch-wide hole in the door. The Volkswagen then continued forward at a greater speed than the tractor trailer, causing the front passenger door to be pulled backward and torn off. McLaughlin opined that Veverka's arm was severed as this occurred; he traced bloodstains leading from the point of the collision to the location where the arm was found. After the impact split the Volkswagen in two, the back half moved backward across the highway, entered the median and flipped over the center guide rail — ejecting Tamboia — before coming to rest in the eastbound lane. The front half continued forward on its wheels for 50 to 75 yards, sideswiped the tractor trailer once, entered the median, ejected defendant and Veverka toward the west as it dug into the ground, and came to rest against the guide rail.
As for the Volkswagen's speed, McLaughlin testified that the minimum speeds yielded by his initial momentum and energy analyses were, in his opinion, too slow to be consistent with the severity of the Volkswagen's damage. McLaughlin thus consulted another expert accident reconstructionist, obtained additional equipment and conducted further testing. He further performed calculations based upon tachometer and odometer readings depicted in the photograph found in Veverka's phone and data pertaining to the Volkswagen's tires and gear ratio. McLaughlin concluded that the Volkswagen's speed was within one percent of the speed shown on the speedometer when the photograph was taken, that the photograph was taken approximately 1.1 miles before the collision site and 26 to 28 seconds before the crash, and that the Volkswagen was moving between 145 and 147 miles per hour when it struck the tractor trailer.
As for the occupants' positions in the car, McLaughlin opined, as had Sikirica, that Tamboia was in the rear passenger seat at the time of the crash. He further opined that Veverka was in the front passenger seat, specifically noting the severity of his injuries on the right side, the fabric found in the passenger door and the corresponding locations of the hole in the door, the torn underwear and the wound in Veverka's right hip. By process of elimination, these determinations placed defendant in the driver's seat — a position that McLaughlin opined was consistent with the physical evidence, including the location of defendant's injuries primarily on his left side, the relative mildness of his injuries, the lack of significant damage to the driver's seat, and the fact that defendant was found near the front half of the Volkswagen, a considerable distance from the back half. McLaughlin rejected the defense theory that defendant could have been thrown from the backseat into the driver's seat between the two collisions, while Veverka was thrown into the passenger seat, opining that such a theory was not consistent with, among other things, the force of the first impact, the physics of the Volkswagen's movements and the split-second interval between the two collisions.
Had the jury discredited the opinions of the People's experts and accepted the defense theory that the DNA in the driver's seat area proved that Veverka was driving at the time of the collision, a different verdict would not have been unreasonable. Accordingly, we "must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks and citation omitted]). We reject defendant's argument that McCrindle's testimony regarding defendant's first admission that he was driving was incredible in view of defendant's unresponsive condition, as the jury could have found McCrindle's testimony to be consistent with that of the witnesses who said that defendant was able to give one-word responses. We likewise reject defendant's argument that the DNA evidence conclusively established that Veverka was driving. The evidence permitted the reasonable conclusion that the absence of defendant's DNA from the driver's area was explained by the thorough cleaning that defendant had performed earlier that day and that Veverka had driven the vehicle during the trip from defendant's apartment to the bar or that his DNA was transferred from the passenger side to the driver's side during the accident. In view of the expert testimony and defendant's admissions, and according the appropriate deference to the jury's credibility determinations, we find that the verdict is supported by the weight of the evidence (see People v Hoffman, 130 AD3d 1152, 1156-1157 [2015], lv denied 26 NY3d 1009 [2015]; People v Reichel, 110 AD3d 1356, 1363 [2013], lv denied 22 NY3d 1090 [2014]).
Supreme Court did not err in denying defense counsel's motion to suppress defendant's statements to Schroll and Burns at the hospital on the ground that defendant was not given Miranda warnings. "[T]he safeguards required by Miranda are not triggered unless a suspect is subject to custodial interrogation[, and t]he standard for assessing a suspect's custodial status is whether a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave" (People v Paulman, 5 NY3d 122, 129 [2005] [internal quotation marks and citations omitted]). "Factors to be considered include the location, length and atmosphere of the questioning, whether police significantly restricted defendant's freedom of action, the degree of defendant's cooperation, and whether the questioning was accusatory or investigatory" (People v Pagan, 97 AD3d 963, 966 [2012] [citations omitted], lv denied 20 NY3d 934 [2012]). Here, the interview took place in a medical setting rather than a police station and lasted only about five minutes. Schroll and Burns did not handcuff defendant or threaten him with arrest and did not tell him that he was not free to leave. There was no testimony that defendant expressed a wish to leave or reluctance to speak with them, and the nature of the questioning was investigative rather than accusatory. Although there was a notation on the blood-sample consent form to the effect that defendant had been arrested for driving while intoxicated, there was no evidence that this notation was added before defendant signed the form or that a reasonable person would have been aware of it, and defendant was not, in fact, placed under arrest until several days later, upon his release from the hospital. According the appropriate "great weight" to the court's factual determinations and credibility assessments (People v Muniz, 12 AD3d 937, 938 [2004]), we find no reason to disturb the determination that the interview was not custodial and, thus, that Miranda warnings were not required (see People v Carbonaro, 134 AD3d 1543, 1547 [2015], lv denied 27 NY3d 994 [2016]; People v Figueroa-Norse, 120 AD3d 913, 913-914 [2014], lv denied 25 NY3d 1071 [2015]; People v Lewis, 83 AD3d 1206, 1207-1208 [2011], lv denied 17 NY3d 797 [2011]).
Defendant failed to preserve his appellate contention that McLaughlin did not have the necessary qualifications in physics, biomechanical engineering and occupancy kinematics to render an expert opinion as to the positions of the occupants of the Volkswagen, as he raised no such objection at trial (see People v Menendez, 50 AD3d 1061, 1061-1062 [2008], lv denied 10 NY3d 937 [2008]; People v Mack, 273 AD2d 939, 939 [2000], lv denied 95 NY2d 966 [2000]; People v Brown, 243 AD2d 282, 283 [1997], lv denied 91 NY2d 870 [1977]). If the claim had been properly before us, we would not have found that McLaughlin lacked qualifications on this ground, as he testified that his collision reconstruction training included over 1,700 hours of training in subjects that included applied physics, biomechanics and occupant kinematics and, further, that he had 18 years of experience in accident reconstruction and had participated in 541 reconstructions (see People v Lashway, 112 AD3d 1222, 1223-1224 [2013]). Defendant likewise [*4]failed to preserve his claim that McLaughlin did not use accepted scientific methodologies or mathematical calculations in concluding that defendant was in the driver's seat, as he neither objected on this ground nor showed that the methods and calculations that McLaughlin used were not accepted as reliable in the field of accident reconstruction (see generally People v Angelo, 88 NY2d 217, 223 [1996]). These contentions and defense counsel's remaining criticisms of McLaughlin's methods, including his purported failure to give adequate consideration to the DNA evidence, were addressed upon cross-examination and went to the weight, rather than the admissibility, of the testimony (see People v Miller, 239 AD2d 787, 788-789 [1997], affd 91 NY2d 372 [1998]).
Defendant further contends that Supreme Court erred in permitting McLaughlin to offer his professional opinion on the ultimate issue of whether defendant was driving at the time of the crash. Defendant's appellate objection on this ground is unpreserved, as he made no such objection when McLaughlin testified on this subject (see People v Ramsaran, 154 AD3d 1051, 1055 [2017], lv denied 30 NY3d 1063 [2017])[FN3]. Had the issue been preserved, we would have found no error, as an expert may give an opinion on the ultimate issue before the jury where, as here, "it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror" (People v Rivers, 18 NY3d 222, 228 [2011] [internal quotation marks and citation omitted]; accord People v Ramsaran, 154 AD3d at 1055; see Guide to NY Evid rule 7.01 [3], Opinion of Expert Witness).
For similar reasons, Supreme Court properly allowed Sikirica's testimony. Defendant preserved his claim that Sikirica lacked qualifications to opine on the locations of the vehicle's occupants by objecting during the trial on the ground that Sikirica had no training in accident reconstruction (see CPL 470.05 [2]). Nevertheless, the claim lacks merit. Notably, Sikirica limited his opinion to the precise time of the second collision, freely acknowledging upon cross-examination that he could not opine as to where the occupants were seated when the first crash occurred, or whether their bodies moved before the second collision. He testified solely as to his professional opinion on the positions of the three occupants at the moment of the second collision. This testimony was based upon, among other things, their injuries and the vehicle damage, and was fully within Sikirica's professional expertise regarding the mechanism of the victims' injuries and the causes of their deaths. Sikirica testified that he had conducted over 10,000 autopsies, many of which involved high speed crashes. Based upon this experience and his professional training, he was fully "possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the information imparted or the opinion rendered is reliable" (People v Wynant, 98 AD3d 1277, 1277-1278 [2012] [internal quotation marks, emphasis and citation omitted]; see People v Paun, 269 AD2d 546, 546 [2000], lv denied 95 NY2d 801 [2000]). Defendant's remaining arguments related to Sikirica's testimony are unpreserved.
Defendant next contends that Supreme Court erred in granting the People's motion in limine to preclude defendant's expert psychiatrist from testifying about the effects of intoxication and trauma on short-term memory formation. "It is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefitted by the specialized knowledge of an expert witness" (People v Murphy, 79 AD3d 1451, 1452 [2010] [internal quotation marks and citations omitted], lv denied 16 NY3d 862 [2011]). Here, the court found that the expert's testimony would be an improper means of buttressing defendant's position that he did not remember the accident. This view is supported by the record, as the testimony that defendant was confused and only partially responsive after the accident permitted the jury to infer that his cognitive abilities could have been affected. Further, the proposed testimony was "within the average juror's understanding, not beyond the range of [*5]ordinary knowledge or intelligence and does not require professional or scientific knowledge" (People v Johnston, 273 AD2d 514, 517 [2000], lv denied 95 NY2d 935 [2000]; accord People v Vanderhorst, 117 AD3d 1197, 1201 [2014], lv denied 24 NY3d 1089 [2014]). Thus, the court did not abuse its discretion in precluding the testimony (see People v Ignatyev, 147 AD3d 489, 491 [2017], lv denied 29 NY3d 1033 [2017]; People v Paro, 283 AD2d 669, 670 [2001], lv denied 96 NY2d 922 [2011]).
Finally, defendant contends that Supreme Court prevented him from presenting a defense by granting the People's objections on hearsay grounds when defense counsel sought on cross-examination to elicit testimony from defendant's roommate that, during the party, he heard Veverka express an interest in driving defendant's car. Defendant asserts that the statement was not hearsay and, in the alternative, that it fell within the state of mind hearsay exception (see People v D'Arton, 289 AD2d 711, 712-713 [2001], lv denied 97 NY2d 728 [2002]; Guide to NY Evid rule 8.13 [1] [a], Declaration of Future Intent). The claim that the statement did not constitute hearsay is without merit, as it was plainly "offered in evidence to prove the truth of the matter asserted in the statement" — that is, that Veverka expressed a wish to drive the Volkswagen (Guide to NY Evid rule 8.00 [1], Definition of Hearsay; see People v Romero, 78 NY2d 355, 361 [1991]). Defendant's alternative contention regarding the state of mind exception is unpreserved for appellate review, as defense counsel made no such argument at trial (see CPL 470.05 [2]; People v Atkinson, 150 AD3d 870, 870 [2017], lv denied 30 NY3d 947 [2017]; People v Esteves, 152 AD2d 406, 412 [1989], lv denied 75 NY2d 918 [1990]).
Egan Jr., Clark, Mulvey and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Upon appeal, defendant does not dispute that Tamboia was seated in this position.

Footnote 2: McLaughlin had retired by the time of the trial.

Footnote 3: Defense counsel objected to some of the prosecutor's multiple questions about the position of the vehicle's occupants on foundational grounds, but did not object to other questions and never asserted that any of the questions improperly usurped the jury function.